# Exhibit F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HARTFORD INSURANCE CO., EUGENIA CARVALHAL
Plaintiffs

C.A. NO. 06-362 S
C.A. NO. 07-07 S

vs.

Providence, RI
SEPTEMBER 14, 2007

GENERAL ELECTRIC AND MIDEA USA
Defendants

BEFORE MAGISTRATE JUDGE LINCOLN D. ALMOND
(Motions)

APPEARANCES:

FOR THE PLAINTIFFS: (Hartford)
ERIK LOFTUS, ESQ.
Law Office of Stuart Blackburn
Two Concorde Way PO BOX 608
Windsor Locks, CT 06096
860-292-1116

(Hartford)
KEVIN S. COTTER, ESQ.
401-454-5350

(Carvalhal)
ROBERT A. D'AMICO, II, ESQ.
536 Atwells Ave.
Providence, RI 02909
401-454-1212

FOR THE DEFENDANTS: (GE and Midea USA)
RODD E. ELGES, ESQ.
Clausen Miller, P.C.
10 South LaSalle St.
Chicago, IL 60603
312-855-1010

JOSEPH-ANTHONY DiMAIO, ESQ.
McKinnon & Harwood
1168 Newport Ave.
Pawtucket, RI 02861
401-454-1212

SEPTEMBER 14, 2007

THE COURT: We're here today in the matters, Hartford Insurance Company versus General Electric and Midea USA. Case Number 06-362 S, consolidated with Carvalhal versus the same defendants, 07-07 S. Before the Court today for Report and Recommendation are two motions filed by the defendants.

The first is a motion for summary judgment as to Plaintiffs' Express Warranty claims. That's document Number 16 in case 707, and document 39 in case 6362. And also, defendants' motion to preclude experts and for summary judgment, document Number 17 in 707 and 42 in 6362. Can counsel please identify themselves for the record?

MR. LOFTUS: Erik Loftus for the plaintiff Hartford.

MR. COTTER: Kevin Cotter for the plaintiff Hartford.

MR. D'AMICO: Bob D'Amico for plaintiff Eugenia Carvalhal.

MR. ELGES: Rodd Elges on behalf of the defendants, your Honor.

MR. DiMAIO: Joseph DiMaio on behalf of the defendants.

THE COURT: All right. First off, as I review the docket it looks like the motion for summary judgment as

to the express warranty claims was not opposed, is that correct?

VOICE: That's correct, your Honor.

VOICE: That's correct, your Honor.

THE COURT: All right. So that will be granted, absent opposition, I will pursuant to Local Rule. I assumed that was the case but I didn't want to do that without checking with counsel. All right. So what we have on today for argument are the motions for summary judgment as to the experts. I have reviewed the extensive submissions by both parties so I don't need you to repeat everything in your pleadings, but I will give both sides the opportunity to present argument today and maybe focus me in on what they believe are the important parts of their arguments. Start out with you it's your motion, Mr. Elges.

MR. ELGES: Yes, it is, your Honor. As the Court is aware, this case stems from a residential --

THE COURT: Why don't you speak from the podium if you don't mind.

MR. ELGES: Oh. Once again, Rodd Elges on behalf of the defendants in this matter, Judge.

THE COURT: Yup.

MR. ELGES: This case stems from a residential fire that happened in East Providence on February of 2004 as the Court is aware. Subsequent to that fire the plaintiffs

in this case filed a six count product liability law suit alleging that the water dispenser located in the Carvalhal's kitchen which was manufactured and distributed by my clients, Midea and GE, contained a defect which caused a fire to erupt inside the water dispenser itself and spread to the remainder of the Carvalhal's kitchen. To prove a prima facie case under any of the six theories of liability set forth in the plaintiffs' complaint plaintiff has acknowledged that they need expert testimony establishing that (1) our water dispenser was defective, and (2) the defect within the water dispenser was a proximate cause of the plaintiffs' injuries which in this case is a fire.

To understand the gist, as it were, of the defendants' motions in this case, I think it's important to consider what their experts' theory of liability boils down to, Judge. Their theory of liability essentially states that -- well, depending on what day it is I guess, in their Rule 26 (a)(2)(b) disclosure which was provided to the Court as part of our second supplemental statement of material facts in this case, both Mr. Davoodi and Mr. Nalbandian's opinions are to the effect that, a cause of the fire was the ignition of insulation materials surrounding the heating element of the water dispenser. And as a result of the malfunctioning of the heating element.

Our argument is, Judge, that pursuant to the standard

for admissibility of evidence set forth in the Daubert Case plaintiffs' experts are unable to provide competent, admissible, expert witness testimony to substantiate that claim.

THE COURT: Just so I can just focus this in, isn't Mr. Davoodi's opinion for the most part limited to the origin of fire? He does an analysis to determine that the fire originated at the water dispenser and then spread throughout the kitchen. And then it's Mr. Nalbandian and Mr. Cooney who come up with this theory about the leak, the corrosion, the corrosion on the heat sensor allowing it to get too hot and lighting on fire?

MR. ELGES: Yes, Judge. The experts in this case divide the division of labors. Whereas, Mr. Davoodi serves as the expert who is attempting to opine regarding the origin of the fire, and Mr. Nalbandian and Mr. Cooney are attempting to say what caused it. And our argument against the admissibility of the causation opinions in this case, it turns in part on the inadmissibility of Mr. Davoodi's opinions regarding the origin of the fire in this case. As Mr. Davoodi acknowledged during his deposition, before you can testify as to the cause of a fire a origin of the fire must be determined. And inasmuch as Mr. Davoodi was not qualified to render opinions regarding the origin of the fire, all the work that Mr. Nalbandian and Mr. Cooney did is

for naught.

THE COURT: Isn't that what Mr. Davoodi does for a living?

MR. ELGES: Judge, we believe that the case law establishes that general knowledge regarding a particular field of expertise does not necessarily make an expert's opinions admissible. While Mr. Davoodi has investigated numerous fires, he acknowledged himself that he has never investigated a fire involving a water dispenser. And while that might seem to be putting too fine a point --

THE COURT: Well, what if my house burned down and one of my kids bought one of these newfangled i-phones and I thought the fire started in the i-phone, and I wanted to claim a product defect in the i-phone that caused this fire. Would I be precluded from bringing a case because I couldn't find a fire expert who investigated the fire caused by an i-phone?

MR. ELGES: Not necessarily, Judge, I think.

THE COURT: Well, isn't that what you're saying? That they need to have a fire expert who is a water cooler fire expert?

MR. ELGES: No, Judge.

THE COURT: All right.

MR. ELGES: What we're arguing is that while Mr. Davoodi may have general qualifications to render opinions

about the origin of a fire, he does not have the background and experience necessary under 702 to make his opinions regarding the origin of the fire within this water dispenser admissible. Bear in mind that Mr. Davoodi's opinions in his report are exceptionally specific. He's not only saying that it started in that corner of the kitchen, he's saying that it started within the confines of our water dispenser. And our argument is that for him to pinpoint as it were the origin of that fire with that degree of specificity he needs to show a foundation for such an opinion which he is unable to do. He's unable to do it because he's never investigated a fire involving a water dispenser before, he's never been involved with the design and manufacture of a water dispenser. So we believe that his testimony is a generalist opinion which is excluded in accordance with (Phonetic Spelling) Hoechan vs. Bobscrew which says you need to show some expertise with regard to the specific product at issue. That's also upheld in (Phonetic Spelling) Tocayo Marine And Fire Insurance vs. Grove. So I'm not saying that you can't find an expert for your ipod fire, Judge, you just need to find someone who, (1) has expertise generally as a fire investigator, and (2) can demonstrate the necessary expertise to render reliable opinions regarding i-phones. Mr. Davoodi's opinions in this case are also undercut by his failure to gather sufficient data. As you know, 702

requires that for an expert opinion to be admissable in court, it needs to satisfy a two prong test. One, the witness has to be qualified as an expert to render opinions in that field which we just talked about as for Mr. Davoodi. Even if he was qualified to render opinions as to the origin of the fire in this case, that doesn't get him into the court house. What gets him into the court house is satisfying that second prong which is gathering sufficient information and data, relying upon accepted scientific principles and methods, and applying those methods of science to reliable data. Mr. Davoodi can't satisfy that second prong because he left all the evidence at the fire scene, Judge. He walked in the door after being assigned to investigate the Carvalhal fire by his firm. His firm was hired by the Hartford Insurance Company. The Hartford Insurance Company had an eye on a subrogation claim and wanted to develop some sort of basis for that claim which is what Mr. Davoodi did. He did a quick walk through fire investigation. He took some photographs. He allegedly took some measurements which he did not document and then walked out the door. Later he generated a report that provides some narrative as to what he did and who he talked to on the fire scene. But that report does not and cannot include the empirical data, Judge, necessary to render any scientific opinions in this case. You've seen in the briefs that there

is a lot of back and forth as to what evidence Mr. Davoodi actually gathered at the site. And I want to make a distinction between what he did at the site and what he came away from the site with. They claim that he took measurements --

THE COURT: What would he do other than take measurements and take pictures to gather evidence as to the origin of the fire?

MR. ELGES: All right. Typically an origin fire investigation, Judge, involves not only taking photographs of a fire scene to document what can be visualized, but also empirical measurements of the dimensions of the room, the dimensions, the very aspects of the inside interior of a room to determine the relative size of the objects therein. In addition to that, there's a determination of char patterns. They make much of the burn patterns, char patterns, smoke patterns at the fire scene. But while there's some photographs of those there's no empirical evidence as it were as to where those smoke patterns were formed, the depth of the char on the cabinets for example. And in light of the absence of any empirical data or facts as it were, Mr. Davoodi is not in a position to opine that the facts that he observed on the ground on that day can now be serving as a basis for his opinions in this case. And that's very important for two reasons, Judge. One, under

702 he needs to show that he has sufficient evidence to render opinions in this case. And, (2) if these opinions were to come in, because there is no documentation regarding the measurements, some of the measurements that he apparently did that day, the defendants are not in a position to adequately cross-examine him as to why whatever evidence he thinks he has serves as a basis for his opinions in this case. Now, in addition to --

THE COURT: Well, if his factual basis for his opinion is so faulty, wouldn't that give you a lot of ammunition to cross-examine him in an attempt to discredit him if he were to testify before a jury?

MR. ELGES: The problem with cross-examination, Judge, is that it doesn't unring the bell as it were. And ultimately if these opinions go before the Court it's going to be an invitation for the jurors to speculate as to how this fire was caused and its origin because they can't close the loop as it were scientifically, the jurors are going to be basically put in a position where plaintiffs will be able to argue because this tank leaked and the fire happened after the leakage, the leakage caused the fire which is a logical fallacy. Just because something happens after an event doesn't mean that first event caused the second event.

THE COURT: Wouldn't that be a matter for argument and for Judge Smith's instructions to the jury as

to what would be proper for them to conclude based on the evidence?

MR. ELGES: Giving -- the instructions regarding giving evidence relative weight are appropriate, Judge, but they're only appropriate if the underlying opinions themselves are scientifically reliable which they are not in this case. As far as the other problems with Mr. Davoodi's investigation of the fire scene. In addition to not coming away with empirical measurements about the dimensions of the kitchen, the depth of char on the various fire damaged portions of the kitchen, he didn't walk away with other physical evidence that he could have taken from the fire scene. He walked away with a mixer which was on the counter next to where the water cooler was allegedly located. He walked away with an outlet which he doesn't know whether or not the fire -- whether the water dispenser was plugged into it or not. And, unfortunately, he left a coffee pot in that same area of the kitchen which we would have -- the plaintiffs -- I'm sorry, the defendants are greatly prejudiced because we're being denied the opportunity to test that coffee pot. So it's not only the measurements that were left behind at the scene, Judge, the other relevant evidence was left behind at the scene. And this goes to the issue of whether or not Mr. Davoodi adequate --

THE COURT: Where was the coffee pot? Is it

shown in any pictures?

MR. ELGES: The coffee pot depicted in both photographs taken by the East Providence Fire Department and Mr. Davoodi himself I believe is located in the same corner of the kitchen on a counter top next to where the water dispenser was. And before I walk, you know, get beyond where the water dispenser was, NFPA requires that if you believe that there's an appliance involved in a fire, one of the tests for a proper fire origin investigation is to establish a location of that appliance with scientific certainty. And in this case Mr. Davoodi did not attempt to do that. He did not perform any measurements regarding where he believed the water cooler was. He did not generate any empirical evidence to show the relative size of that water cooler in comparison to the counter it was next to so we could compare where the burn patterns on the wall ended up being. So they make much, plaintiffs' counsel claims that Mr. Davoodi didn't know about the water cooler. Our reply establishes very clearly that he interviewed the homeowners in this case and the homeowners advised him that there was a water dispenser in that corner of the kitchen and that had been taken from the scene by the East Providence Fire Department. So Mr. Davoodi was aware that the East Providence Fire Department suspected but did not know whether the water dispenser was the cause of the fire and

yet he failed to generate empirical scientific evidence in the form of measurements to establish where that water dispenser was, its relative size to the adjacent area, and how it's --

THE COURT: If the water dispenser was gone how would he do that? Would he ask the homeowners, "Where was your water dispenser?"

MR. ELGES: That would be one way, Judge. And another way, based upon Mr. --

THE COURT: Couldn't he do that with a picture? Get a picture say, "Where was your water cooler?" And say, "All right, the water cooler was placed here." It's a standard size counter top and extrapolate from that?

MR. ELGES: I asked him about that during his deposition and he testified to me that he was unable to provide us with the scale to determine those measurements based upon the photographs which goes to the issue, Judge, whether or not these photographs which are the bulk of Mr. Davoodi's report can supplement and serve as scientific evidence to base his opinions on and the answer is no. I mean, he didn't take any measurements regarding the counter tops, he didn't take any measurements regarding the area in the wall where there are no burn patterns which is the basis for his claim that that's where the water dispenser was located and that's where the fire originated, Judge. Now,

without sufficient evidence Mr. Davoodi is not in a position to opine regarding the cause of this fire, or the origin of this fire, Judge. And if Mr. Davoodi is unable to render an origin opinion, Mr. Cooney and Mr. Nalbandian can't testify as to the cause of that fire, they are inter-reliant, Judge. So, ultimately we believe that Mr. Davoodi's not qualified to render an origin opinion regarding the cause of this fire. And even if he was qualified to render such an opinion, he lacks sufficient evidence to render such an opinion.

THE COURT: All right. Let's move on to the cause experts and why you feel they should not be allowed to testify.

MR. ELGES: Once again, the causation experts, Mr. Nalbandian and Mr. Cooney, lack sufficient expertise to render any causation opinions in this case. Mr. Nalbandian acknowledged that he's a mechanical engineer not an electrical engineer. That he has never been involved in the design and the manufacture of a water dispenser, and he's never investigated a water dispenser fire prior to the Carvalhal case.

Mr. Cooney, who's a metallurgical engineer, acknowledged that he's not an electrical engineer. He acknowledged that he is not an expert in the field of product design and manufacture. He admitted that he lacks

sufficient expertise to render opinions regarding electrical devices generally. And is, in particular, not qualified to render opinions regarding electrical systems incorporated into consumer products. And I want to stress that if I could, Judge. That's an admission that Mr. Cooney made in his deposition. And Mr. Nalbandian at page 156 --

THE COURT: This is page 156 of Mr. Cooney's deposition?

MR. ELGES: No, this is Mr. Nalbandian, your Honor.

THE COURT: Well, get back to what you claim was an admission made by Mr. Cooney. What's the page reference to that?

MR. ELGES: Mr. Cooney admits that he lacks the expertise necessary to render any opinions regarding electrical systems incorporated into consumer products such as the Carvalhal's water cooler at page 22-23 of his deposition. So Cooney admits, I can't opine regarding the electrical system in this device. Similarly, Mr. Nalbandian testified that he's not familiar with the way the temperature control switches work in this unit, that he could not opine regarding whether the switches in the unit malfunctioned on the day in question. Testimony at page 156 and 157 of his deposition he acknowledged that he was not able to testify that the temperature that the heating coil

would have reached had the sensors failed. He doesn't know what that temperature would be at 142. And he acknowledged that he didn't perform any testing on either the Carvalhal's unit or the exemplar units at 135-137. While their opinions in this case have shifted from saying the sensors failed, let the heater run continuously causing the water cooler to ignite. They've walked away from those opinions because they can't opine about them. They're basically trying to make more generic opinions, Judge, saying, "Well, we're not really sure how the fire ignited and what caught fire. But we're sure that the leaky water tank caused these electrical components to fail, malfunction, and ignite a fire." How can they make those opinions, Judge, if both of them acknowledge that they lack scientific foundation, the expertise as it were to render opinions of that nature? Just to clear --

THE COURT: Just so I can understand. Their opinion is that there was some leak in the tank and then that came down the outside of the tank, and there are corrosion patterns which lead to certain electrical components. And then they opine that those electrical components, particularly the heat sensor, malfunctioned because of the corrosion?

MR. ELGES: In their Rule 26 disclosure, that's the gist of it that because -- the defect that they testify

is present in our product is the chloride insulation around the hot water tank. They're claiming that the chloride insulation around this water tank combined with available water at a sufficient temperature leads to the corrosion of the water tank. Just to let you know I'm not asking for the moon here, I think they're qualified to make that opinion, Judge. Mr. Cooney is a metallurgical expert. He did testing to establish how the fracture in the water tank occurred. He did testing, Judge, to determine that the insulation on the outside of the water tank contained the chloride necessary to cause the corrosion. I don't dispute that, Judge, I think it's an excellent example of Mr. Cooney and Mr. Nalbandian coming up with a theory. Then they tested the theory and their testing proved the theory. And what they've proved, Judge, and all they've proved, Judge, is that the chloride containing insulation around this hot water tank caused it to corrode and leak. Now, if I was being sued, if the defendants were being sued for water damage, to the Carvalhal's house we wouldn't be here at this point. But what the defendants are being accused of is having a defect in their water dispenser which caused a fire. They can't get from Chloride in the insulation to the fire. The piece that they're missing is, as I noted in our briefs, the two other aspects of the fire triangle, a source of ignition and a fuel. Now, they're saying that the source

of ignition in the Rule 26 disclosure, which they walked away from during their depositions, they claim that the source of ignition is the overheating water heater element. I got both Mr. Nalbandian and Cooney to admit that neither one of them know how hot that heating coil would have got under normal operating conditions, and how hot it would have got if it was allowed to run continually. Because they were not able to establish scientifically how hot the heating coil could get they were forced to walk away from the coil overheated hypothesis. So, in Mr. Cooney's deposition he tries to recover by saying, "I'm not sure what it was but it was some aspect of the electrical system that malfunctioned and ignited this fire." But in his testimony he testifies unequivocally that he's not qualified to opine regarding electrical systems incorporated into consumer products. So that's why we don't believe Mr. Cooney or Mr. Nalbandian are qualified to render opinions regarding an electrical malfunction in this water dispenser which was capable of igniting the fire. Even if they were qualified to render those opinions, Judge, they didn't do the scientific testing necessary to substantiate those opinions. They didn't test the water heater unit to determine how hot it would have got if it was allowed to run continually. And just as importantly, they didn't establish the fuel aspect of the fire triangle. They didn't examine the plastics and other

components that were in and around that water cooler that were supposedly what ignited to cause this fire. Now, they make much, plaintiffs make much, of the fire damaged nature of the Carvalhal's water cooler. That won't save them here, Judge. It won't save them for a couple of reasons. One, they did perform testing on the insulation found in the Carvalhal's water cooler which establishes that while it was fire damaged, there were aspects of the Carvalhal's water cooler that could still be analyzed. And I find great fault with them for analyzing the insulation material to determine that it contained chloride so they can close the loop on their corrosion theory but not testing that same insulation material, Judge, to determine at what point it would have caught fire. They didn't do it. They could have done it they had the sample. Even if you -- the Court buys into their claim that we can't test the components of the Carvalhal water cooler because they were too fire damaged they had not one, Judge, but two exemplar units they could have tested. They didn't test them out of budgetary concerns and because they weren't asked to perform that testing. So, you know, the plaintiffs' theory of the case shifts based upon what day it is and what questions they're being asked. First, they say the water combined with the chloride insulation caused a leak in the water dispenser. The leaking water caused the sensors on the outside of the tank which are

supposed to turn the water heating element on and off to malfunction the heating element ran continually and caused materials around it to catch fire. When I established that neither Mr. Nalbandian or Mr. Cooney had the scientific expertise to opine regarding how the water sensor, the temperature sensor, operated they walked away from that theory during Mr. Cooney's deposition. He said, you know, I don't really understand with specificity how that water temperature switch works, but I'm sure that something, and literally you can look at the Hartford's response. It says surely something electrical malfunctioned in the water dispenser and caught fire. That's not good enough, Judge, under 702. Under 702 in addition to having qualified experts to opine regarding issues in a case, you have to establish that there's sufficient evidence and facts, that there are some principles being applied, and that the experts are applying the principles to the facts in the case appropriately. Once again, an excellent example of scientific work is Mr. Nalbandian and Mr. Cooney saying, "I wonder what caused this water tank to leak?" They said maybe it's the insulation around it. They established through scientific testing the insulation contained chloride. They established through some metallurgical analysis why the tank itself cracked. Excellent work. I can't keep that out. But as far as getting from a leaking water tank to something

happening with the electrical system to cause a fire that they did not do. They had an opportunity with both the Carvalhal water dispenser and those two exemplars to look at the sensors, determine scientifically whether or not the sensors failed which they have not done. In addition to determining whether or not the sensor failed they could have examined the water heater to determine how hot would it get under normal operating conditions. They didn't do that, Judge. How hot could it get if the sensor failed and didn't turn it off allowing it to run continually. They didn't do that. Could have done it with the Carvalhal water dispenser. Could have done it with either of the two exemplars. Didn't see fit to do it. Didn't apply, science, Judge. Those opinions that they're trying to render regarding those items aren't admissible.

And, finally, with regard to the third leg of the fire triangle, the fuel. They had an opportunity. I mean, they literally took a sample of the insulation material from outside the water tank and analyzed it for content. They found out there was chloride in it. It would have taken probably one or two other tests to determine the flammability of that material. They didn't do it. They didn't perform any analysis of any of the components of the water dispensers, any of the three water dispensers they had to determine the relative flammability. So for them to get

from water being leaked out of the water tank because of the corrosion to ignition of a fire in this case they don't have the science to do it, Judge.

THE COURT: All right. Anything further?

MR. ELGES: One moment, your Honor, please. In summary, Judge, the expert inquiry performed by the plaintiffs' expert in this case was flawed from the beginning. Mr. Davoodi had the best opportunity to gather sufficient evidence not only for his opinions but for the cause opinions of Mr. Nalbandian and Mr. Cooney. Because from the gitgo, Mr. Nalbandian's -- I'm sorry, Mr. Davoodi failed to do a proper origin investigation, the causation opinions are not reliable. Inasmuch as Mr. Davoodi did not document the fire scene, he's not in a position to opine regarding the origin of the fire. Moreover, because he failed to collect evidence that he should have collected at the fire scene he's not able to rule out the various other electrical appliances which were present at the fire scene including a coffee maker which is now missing. Including the range top which he did not examine. So before you even get to the causation opinions in this case, the origin case -- the origin opinions in this case are inherently flawed and not admissible under 702. Likewise, despite their attempts to shift their theory of the case depending on what day it was, the causation opinions in this case are not admissible

because neither Mr. Cooney or Mr. Nalbandian are qualified to render opinions regarding a malfunction of the electrical system in this water dispenser, and moreover, they don't have sufficient data which was available to them to collect and analyze to render opinions in this case. So, with that I have nothing further at this time.

THE COURT: All right. Mr. Loftus. Mr. Loftus, do you sell boats on the side? Do you have a side business?

MR. LOFTUS: I do not.

THE COURT: All right. A friend of mine showed me a printout he got off the internet of a boat he was looking at, a sailboat, and it had listed as the sales person, Erik Loftus, and I thought, "God, that name sounds familiar."

MR. LOFTUS: Maybe in 20 years I'll have enough to. Good morning, your Honor.

THE COURT: So you have a -- you have someone with your same name, I think it was up in the Boston area.

MR. LOFTUS: We're actually good friends with an attorney with the same last name no relation up in the Boston area too, Patrick Loftus.

THE COURT: Well, maybe it's that family. All right. Sorry to divert your attention.

MR. LOFTUS: Nope. Not a problem.

THE COURT: All right. So why should I recommend to Judge Smith that your experts be allowed to testify

before a jury?

MR. LOFTUS: Well, I think the bulk of my response is contained in my reply brief which is, it's fairly lengthy so I won't go into the majority of that now. I would just like to, you know, state some general propositions and then respond to attorney Elges's argument in that certain elements were raised only in his reply brief and which we were given no opportunity under the federal rules to respond to.

The first statement I'd like to make is that I think we're overstating the relevant inquiry. The relevant inquiry should be a little bit more basic than what Attorney Elges would like the Court to believe.

The first relevant inquiry would be whether the experts offered in this case are qualified to make the types of opinions that are presented. The follow-up to that inquiry was whether their methodology in arriving at those opinions is sound in light of generally accepted scientific principles. With respect to Mr. Davoodi. I think the Court recognized that this is what he does for a living. He's got a professional engineering certificate in fire protection, investigated over 400 fires in a career spanning 20 years. He's a certified fire investigator, and this is what he does, investigates fires and he's more than qualified to do so.

THE COURT: Let me focus you in. I reviewed the reports, the expert reports, and where I'm having trouble as pointed out by Mr. Elges, I'm having trouble drawing the connection between the corrosion leak theory and the how that actually dismantled or, I'm using the wrong word, but how that shut down the heat sensor and then that caused the fire. I'm having trouble following all the steps scientifically that result in that conclusion that the corrosion then tripped off the heat sensor which then caused the fire.

MR. LOFTUS: Your Honor, I think at this point we need to forget about the heat sensor. Yes, in their original report the experts, Mr. Nalbandian and Mr. Cooney, tried to be as specific as possible in giving what they considered was a likely scenario as to the electrical failure in this case. However, at their depositions, they clearly stated that they couldn't be as specific as they were in their report and that in general it was some electrical component in that heating sub system that ignited the fire. That being said, their basic theory is, and I guess it isn't so basic, but the inclusion of chlorides in the insulation around the hot water heater tank, the mixture and combined with the heat caused the metal that was the tank to corrode over time. And, you know, there's ample evidence that the corrosion was in there and took place.

THE COURT: All right.

MR. LOFTUS: The corrosion was allowed to then disperse onto the electrical sub system as well as water from the leaking tank, and at some point that electrical system shorted and ignited and caused this fire. Now, the electrical sub system was damaged beyond any chance of analysis by any expert. Mr. Nalbandian and Mr. Cooney have been working -- Mr. Nalbandian especially has been working in this field for a long time and can recognize when a piece of evidence is beyond any type of analysis and determined that it wasn't in their best interest to retain an electrical engineer in this matter because he would have offered nothing to the overall opinion. Their decision was then to determine, "Well, assuming this electrical sub system was in working order at some point what caused the failure?" And they worked backwards from that point. And it is a basic tenet of any material performance academia that electrical components when exposed to corrosion and water will short and cause fires. This isn't junk science, this isn't new science, this isn't an original idea, this is a basic tenet.

THE COURT: So what basis is there in the record for that tenet, that basic tenet?

MR. LOFTUS: I'm sorry?

THE COURT: What basis is there in the record,

or foundation is there in the record for that basic tenet that if water leaks out it causes a fire?

MR. LOFTUS: I don't believe there is one because it wasn't explored during the deposition. And it's not the plaintiffs' obligation to complete their record. However, Mr. Nalbandian has sent me several articles supporting that tenet. I didn't include them with my response brief only because it wasn't in the record.

THE COURT: So if permitted to testify Mr. Cooney and Mr. Nalbandian will have a theory as to the corrosion of the tank in causing a leak. And then will take the leap to the conclusion that if there's a leak and water gets on electrical components it will spark and cause a fire just generally?

MR. LOFTUS: That's a likely scenario. That's correct.

THE COURT: Not whether it's the heat sensor, or the off and on switch, or any other allege -- or just generally if water gets on the electrical component it will spark?

MR. LOFTUS: It could cause a short, that's correct. And Mr. Cooney --

THE COURT: But then don't need some, if there's a spark, don't you need some fuel to actually something to light on fire if there's a spark?

MR. LOFTUS: Absolutely. And there's no denying that there was ample ignition fuel sources in that water cooler. There was plastics, the wiring itself, the plastic around the wiring. It's unfortunate that all of it was consumed in the fire because we cannot point to which piece was the one that ultimately ignited the fire. And testing of the exemplars, as the defendant suggests, would not have revealed that either.

THE COURT: But couldn't it reveal possible scenarios?

MR. LOFTUS: It did reveal possible scenarios.

THE COURT: If you had an expert, an electrical expert who said, "All right. If this particular component gets wet here's what could happen to this component. Or if the heat sensor gets wet here's what could happen, it could overheat, it could get to the temperature of X, it's in contacts with Y and then it causes a fire."

MR. LOFTUS: Your Honor, they did give that possible scenario in their report that the corrosion around the heat sensor caused it to malfunction and allowed the heater coil to rise to the temperature that it eventually ignited --

THE COURT: Well, once they get to the point of proving the corrosion and the leak and that defect if it is one, then how is their speculation as to, well water got on

electrical stuff and caused a fire? How is their speculation as to that any different then my uneducated speculation?

MR. LOFTUS: Because, your Honor, I'm not sure of your education background or your experience in this field, but Mr. Cooney and Mr. Nalbandian are esteemed professional engineers in their fields and have certainly general knowledge related to all engineering fields. While he may not -- they may not be experts with specificity to electrical components and consumer devices, that certainly is no indication of what their qualifications are for certainly much every other aspect of engineering.

THE COURT: What about the arguments made by Mr. Elges regarding Mr. Davoodi's failure to take specific measurements and failure to retain certain evidence from the fire scene?

MR. LOFTUS: Your Honor, it simply wasn't necessary to arrive at the opinions he arrived at. Despite what Mr. Elges has suggested, Mr. Davoodi went to the scene of the fire without any information as to the cause, conducted his burn pattern analysis without any information as to the cause. It wasn't until after he conducted and confirmed his burn pattern analysis that he found out what was in the location of the kitchen where he determined the origin was. And that was from speaking with the homeowners

as well as the fire department.

THE COURT: What's the relevance of the fire department taking the water cooler from the scene? I mean, it's mentioned in the papers repeatedly. And it was mentioned in prior proceedings I've had in the case. What's the legal relevance of that if any?

MR. LOFTUS: I don't think there is any legal relevance. They retained a key piece of evidence, they stored it in good condition, there's been no claims of spoliation with respect to that particular piece of evidence. It was available for every party to see on multiple occasions.

THE COURT: All right. Anything further, sir?

MR. LOFTUS: There's been a lot of talk about a coffee pot. And unfortunately for the plaintiff that coffee pot was never in the area of origin as determined by our fire investigator. Coffee pot fires are common. It would have been an easy case. Water dispenser fires, not very common at all. Mr. Davoodi when he investigated the scene saw no coffee pot, his pictures show no coffee pot. It was not until his deposition when he was shown fire department photos that he saw the coffee pot. And upon examining those photographs he noted, "Well, that's not anywhere in my area of origin anyways." So just because this coffee pot was not seen by the defendants, it was not -- well, we don't know

what happened to it. But it's not really relevant because it wasn't in his area of origin.

THE COURT: So there's a picture that shows, or my recollection is there was a picture that showed the coffee pot unless I'm dreaming.

MR. LOFTUS: There is a picture taken by the fire department at the time of the fire, or shortly thereafter, which shows a, what looks to be a coffee pot on the kitchen counter.

THE COURT: All right. Is that something that's in the record, or is that something that you may have shared with me at the settlement conference?

MR. LOFTUS: It was probably shared with you at the settlement conference and it's mentioned in the papers.

THE COURT: Okay. All right. Anything further?

MR. LOFTUS: I just wanted to note that, you know, the defendants have asked that the bar be set really high. I mean, that measurements be taken that would be not only time-consuming but unnecessary to deliver opinion as to a reasonable degree of scientific certainty. And that's what the standard is. I mean, it's not an absolute certainty standard. I mean, if that was the case it would be almost impossible for any plaintiff to succeed on a product liability case. But we believe the relevant inquiry is, "Are these experts qualified? Did they do a thorough inspection?

And are there opinions have a reasonable foundation?" And in this case I believe they do and my brief expands upon that.

THE COURT: All right.

MR. LOFTUS: There's no junk science at play. I mean, every opinion in this matter is based on physics, materials performance, burn pattern analysis, corrosion. All fairly basic scientific principles.

THE COURT: But you have to prove in this case not only that the fire originated in the water cooler, but it originated as a result of some defect in the design of the water cooler, is that correct?

MR. LOFTUS: That's correct. And in the opinions of Mr. Nalbandian and Mr. Cooney place that defect directly in the manufacturer's inclusion of chloride bridge insulation around the hot water tank. In Thomas v. Amway the court noted that if the plaintiff is unable to directly prove a precise malfunction which caused the ignition -- which you know, based on the burn damage in this case we really are not able to do -- proof of the route cause likely causing such a malfunction combined with evidence that such a malfunction occurred will be sufficient.

THE COURT: What case is this?

MR. LOFTUS: Thomas v. Amway. It's mentioned in my brief. It's a Rhode Island State Court case.

THE COURT: Okay. Anything further?

MR. LOFTUS: No. Thank you, your Honor.

THE COURT: Mr. D'Amico, you wish to be heard?

MR. D'AMICO: I'll be brief, your Honor.

THE COURT: All right.

MR. D'AMICO: Your Honor, the defendants have chosen to attack this issue by way of a motion for summary judgment. So, in deciding or making your recommendation to Judge Smith I would ask you to keep in mind that the standard for summary judgment is an extremely difficult standard for the defendants to satisfy in the context of the way this motion has been brought. In Daubert, when that case was originally decided, there were competing affidavits on the defense side and on the plaintiff's side. Here there is nothing except Mr. Elges's dissatisfaction with the opinions rendered by the plaintiffs' experts. More particularly, with Mr. Davoodi's opinions. Mr. Elges hasn't come forward with any affidavit or fire investigator of his own to undermine the credibility of Mr. Davoodi's work. It's simply Mr. Elges's opinion. There is no evidence to support, or contrary evidence, or affidavit, or testimony from any expert for the defendant to suggest that Mr. Davoodi's fire scene investigation didn't comply with NFPA 921 which we take issue with, or that it was otherwise flawed.

In deciding a motion for summary judgment, any doubts

must be resolved in favor of the nonmoving party. In this case any doubts involving Mr. Davoodi's opinion should be resolved in the plaintiffs' favor. It's simply Mr. Elge's selective use of testimony from a five or six hour deposition to highlight some different points that he disagrees with that he criticizes. Those are points I believe that are more appropriately made at a 104 Preliminary hearing to determine if this testimony should be excluded, or subject of cross-examination. I think the same thing applies with respect to the opinions of Nalbandian and Cooney. Their opinion is, the corrosion caused leakage which caused a malfunction in the electrical system. Mr. Elges would have them go back probably to the assembly line to analyze every single aspect and component of this case or of this water cooler to rule out what could or could not have been a cause. Also the subject of I believe a Rule 104 preliminary hearing, or the subject of cross-examination. But, in the context of this case the experts have rendered an opinion, it's sound and the methodology is sound. If any of those doubts need to be resolved in the plaintiffs' favor, the defendant has no contrary evidence, just his own dissatisfaction, his own opinion, his own argument about that. But he's presented nothing for this Court to understand why his opinion should carry more weight then the experts' opinions. He may not like the opinions he's made

that quite clear through hours and hours of testimony but those are the opinions. I think they satisfy the liberal requirements and standards of Daubert. The arguments he's making seem to me as you pointed out in the original argument especially with respect to Mr. Davoodi issues for product of cross-examination. The defendant chose to take a motion -- to file a motion for summary judgment, he has to live with that procedural decision. I think he's precluded hereafter from asking for a preliminary hearing. He's had his opportunity to address this issue to the Court. The opinions, although he may not like them, I think in the context of deciding a motion for summary judgment with all doubts being resolved in favor of the nonmoving party, that it's a very very difficult burden for the defendants to overcome, much more difficult then has been presented in the argument.

THE COURT: All right. Anything further?

MR. D'AMICO: No. Thank you.

THE COURT: Thank you, sir.

MR. ELGES: If I may, briefly, Judge?

THE COURT: Briefly I'll let you respond, Mr. Elges.

MR. ELGES: First, kind of taking up where we last left off. Judge, it's not the defendants' burden of proof in this case. As the Court is aware we can put at

issue the admissibility of the plaintiffs' experts, experts' opinions in these cases which we have done. And I disagree with the suggestion that I have -- the defendants have not presented affirmative evidence to put their opinions at issue. I didn't need to provide any affidavits, Judge, because my argument hinges all on the evidence that the plaintiffs' experts bring to bear on this case.

To address one of the Court's questions as to whether or not there's a photograph with the coffee pot in place. If I could direct the Court's attention to the defendants' original statement of material facts.

THE COURT: Yup.

MR. ELGES: Exhibit Number C.

THE COURT: Yup.

MR. ELGES: There's some photographs with some date stamped numbers, Judge, in the lower -- actually the way it's bound it's in the upper right-hand corner, HOO--

THE COURT: I'm with you.

MR. ELGES: 494.

THE COURT: 494 is the folder?

MR. ELGES: Yes. And "H" stands for Hartford which means the photographs were produced to us by the Hartford.

THE COURT: All right. I'm with you.

MR. ELGES: As you can see, hopefully your

photographs are the same photograph that I'm looking at. What this photograph depicts, is that in the left foreground, I've got the range, cook top that was in the Carvalhal's kitchen.

THE COURT: Yup. I'm on the same photo I believe.

MR. ELGES: In that corner of the kitchen by the wall as it were on the left-hand side you see a mixer. And then to the right of the mixer you see a coffee pot. And then still further to the right of the mixer you see the remnants of the defendant's water dispenser. This is a photograph as I understand it that was taken by the East Providence Fire Department immediately after the fire occurred. It clearly depicts that the coffee pot was in that corner of the kitchen next to the mixer that Mr. Davoodi saw fit to retain but he didn't see fit to retain the coffee maker. Mr. Davoodi's report makes explicit reference to that coffee pot, Judge. So it was there after the fire department left the scene and took the water dispenser. And it's closer, Judge, it's closer to the water cooler than the mixer is. So our argument is that if Mr. Davoodi, using his vast knowledge of origin investigation, saw fit to take the mixer --

THE COURT: Can I see your photo of that? I can see the coffee pot very clearly. But the mixer not so

clearly in the photocopied version I have. All right, I can see it now. I could see it in this photo but now that it's been pointed out to me the shape of the mixer it stands out in the copy I have. Thank you.

MR. ELGES: If it will further the Court's deliberations my office would be more than happy to provide you with colored photographs of that nature. That provides clear evidence. Evidence that a layman could understand that this is in the area where Mr. Davoodi thinks the fire originated so why didn't he keep the coffee pot? Which goes to the gist of my argument, Judge. Mr. Davoodi may have --

THE COURT: Is there any evidence that the coffee pot was present when Mr. Davoodi did his review of the kitchen?

MR. ELGES: Yes, Judge. Mr. Davoodi in his written report specifically acknowledges the presence of the coffee pot. And just as critically, Judge, I believe he writes that he examined it and ruled it out as a cause -- as an origin of this fire. So if it's in that corner of the kitchen and he went to the trouble of considering it as an origin of the fire why didn't he retain it when he saw fit to retain the mixer right next to it? It doesn't make sense, Judge.

So getting back to Mr. Loftus's claim that Mr. Davoodi is eminently qualified and certified as fire investigator.

That might be true. That's the hardest part of my argument, Judge, arguing that Davoodi's not qualified as an expert in this case. Even if I concede that, Judge, you wouldn't think he was qualified to do fire investigations based upon what he did in this case. He didn't retain the evidence, didn't take measurements which I could have done. A layman could have known that. So that's why Mr. Davoodi's opinions aren't reliable and should not be presented to --

THE COURT: Well, didn't he testify that he took measurements but he didn't record them?

MR. ELGES: He took some measurements, Judge, and that's where things get confusing because first he testifies that you don't always need measurements but you should take them if they're relevant to your evaluation. And he later testified that, "Yeah, I took a few measurements but I didn't write them down." So if they were important enough to need to take to measure to complete his evaluation, why weren't they important enough for him to actually document so he could explain to the jury, "I measured this. This measurement indicates to me, based upon my expertise why this is the origin of the fire." And just as importantly, Judge, why aren't those measurements available to my experts to provide me with ammunition to cross-examine him about these opinions? Which is another reason these opinions must be barred, Judge. They blew the investigation. And for the

Court to say, "Well, there's enough meat on the bone for it to go before the jury" is especially prejudicial to me because they didn't collect sufficient facts for me to cross-examine them. So their error and fault of not collecting sufficient evidence to generate opinions is compounded, Judge, if you admit these opinions. Because in addition to not having a basis or foundation to render these opinions, I don't have any facts to challenge these opinions. So it's highly prejudicial for the Court to consider admitting these opinions.

Mr. Loftus suggests that the Court should take judicial notice that when electrical components get wet they cause fires. I'm not aware of any case law that stands for that proposition. I think the Court can take judicial notice of gravity. I think the Court can take judicial notice. I think Daubert says the Court can take judicial notice of the laws of thermal dynamics. But nowhere in Mr. Cooney or Mr. Nalbandian's opinions do they say I'm relying upon general accepted principles of thermodynamics. They don't say that. So I think you need to reject the notion that electrical components always cause fires when they get wet.

To kind of understand exactly why Mr. Cooney and Mr. Nalbandian's opinions were originally that the sensor malfunctioned allowing the water heater to run continuously and cause this fire, I think it's important to look at their

report in this case. Their report is Exhibit F to defendants' original statement of material facts in this case.

THE COURT: I have it right here.

MR. ELGES: All right. If you could turn to page 4.

THE COURT: I'm with you.

MR. ELGES: The last line on that page is reads as follows: "Evidence indicative of electrical arcing or shorts was not observed." That reflects Mr. Nalbandian's and Mr. Cooney's, one of the two, whoever was opining that day, ability to examine in this case the water sensor itself to determine whether or not an electrical short occurred. They didn't see it. Now this is important for two reasons. One, it indicates that despite their claims that the Carvalhal water dispenser was damaged beyond all recognition to preclude them from analysis to determine whether or not there was an electrical short that they could find physical evidence of they were actually able to do that analysis with regard to the water sensor. And because they -- I believe that they did a visual examination of the rest of the electrical components, they didn't see any other evidence or indication that there was an arc or a short which is why they have to go to the sensor malfunctioning letting the heater run continually theory because they needed an energy

source, Judge. Because they couldn't find any evidence of arcing, or short, they had to go to the only recognizable heating source in that water dispenser unit which was the heating element itself. Which is, if you think about it it does make sense, but they can't prove it. They claim that the corrosion caused the water heater's temperature sensor to malfunction and it allowed the heating element to run continuously. But as Mr. Loftus stated, I think we need to forget about the heater sensor because they can't prove it, Judge. They can't prove it scientifically. And in closing I guess, you know, sometimes clarity comes from case law. If you look at Daubert, there is mention in Daubert of the concept of an expert opinion's testimony fitting a case in quotes. In Daubert, it may be in one of the notes, they talk about whether or not a scientific opinion regarding phases of the moon would be relevant in a case where, if the moon was full that night there was light. And whether or not there's light at night there's an issue in the case. That would be sound scientific evidence that would fit the issues in this -- in that case. But in contrast, if someone was trying to opine that I've studied phases of the moon, the moon was full that night and that explains the defendant's psychotic behavior without a linkup, saying moon being full causes psychotic behavior that evidence wouldn't come in. It's scientific evidence, Judge, about the phases of the

moon. It's just you need to link it up scientifically with an issue in this case. That issue of fitting as addressed in Daubert applies very nicely to this case. As I said before, if this was about a flood and not a fire we wouldn't be here. We wouldn't be here because I think Mr. Cooney and Mr. Nalbandian could opine that there was Chloride, it was a defect in my water dispenser --

THE COURT: No. I think you've covered this part already.

MR. ELGES: All right. Well, ultimately, Judge, they can't link it up scientifically and I believe that the issue or the concept of scientific evidence needing to fit in a case as mentioned in Daubert applies very nicely. I appreciate the Court's time.

THE COURT: All right. Thank you.

MR. ELGES: Thank you.

THE COURT: All right. I am tasked by Judge Smith to issue a report and recommendation to him. I will advise his clerk that there's no opposition to the motion as to the express warranty claim. So either he or I will simply grant that absent opposition pursuant to the applicable local rule.

I will issue a written report and recommendation as to the second motion to preclude the experts. As I'm required to by First Circuit precedent, within that report and

recommendation, I will outline the right of either party to appeal and object to my report and recommendation to District Judge Smith for de novo review.

Anything further today from the plaintiffs? Mr. Loftus?

MR. LOFTUS: No. Thank you, your Honor.

THE COURT: Mr. D'Amico, anything further from the defense today?

MR. D'AMICO: No. Thank you very much for your time, your Honor. If I can just clarify, do you want a copy of the photographs?

THE COURT: No. It's actually fairly clear. And once I saw the color photo I could tell what's there so I don't want that. But thank you for offering. The Court will stand in recess.

( R E C E S S)

C E R T I F I C A T I O N

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Joseph A. Fontes

JOSEPH A. FONTES, COURT REPORTER

October 4, 2007

DATE