# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
OF RHODE ISLAND
C.A. NO. [illegible]

---

THE HARTFORD INSURANCE COMPANY, as subrogee of ALBERTO CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

UNITED STATES DISTRICT COURT
OF RHODE ISLAND
C.A. NO. 07-007 S

---

EUGENIA CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

DEPOSITION OF HOSSEIN DAVOODI, PE, taken on behalf of the Defendant at the offices of Dunn & Goudreau Court Reporting Services, Inc., One State Street, Boston, Massachusetts, on Friday, April 13, 2007, commencing at 10:15 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
(617)742-6900



APPEARANCES:

ROBERT D'AMICO, II, ESQ.
D'Amico-Burchfield, LLP
536 Atwells Avenue
Providence, RI 02909
T(401)454-1217
F(401)454-1233
rad@dblawri.com
Represents Alberto Carvalhal and Eugenia Carvalhal

ERIK LOFTUS, ESQ.
Law Office of Stuart Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096-0608
(860)292-1116
eloftus@sbcglobal.net
Represents The Hartford Insurance Company

RODD E. ELGES, ESQ.
Clausen Miller, P.C.
10 South LaSalle Street
Chicago, IL 60603
T(312)855-1010
F(312)606-7777
Represents General Electric Company and Midea, USA, Inc.



INDEX

| WITNESS | DIRECT | REDIRECT | CROSS |
| --- | --- | --- | --- |
| HOSSEIN DAVOODI | | | |
| By Mr. Elges | 4 | 195 | |
| By Mr. Loftus | | | 189 |

EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| 15 | Disclosure of Expert Witness | 11 |
| 16 | Bates H00512-HOO609 | 11 |
| 17 | Evidence Transmittal Form | 166 |
| 18 | Email | 171 |

Attorney Elges retained the exhibits



PROCEEDINGS

(Whereupon the witness was sworn.)

DIRECT EXAMINATION

Q (By Mr. Elges) Would you please state your full name for the record.
A Hossein Davoodi.
Q Have you ever been known by any other names?
A My family calls me Saeed.
Q Nickname?
A Yep.
Q I'm going to call you Mr. Davoodi this morning for your deposition. My name is Elges; it's been mispronounced countless ways. If I mispronounce your name today I apologize.
Let the record reflect this will be the discovery deposition of Mr. Davoodi taken pursuant to notice in agreement with the parties.
Let the record further reflect that all parties in this lawsuit are now represented by counsel here this morning. It's 10:15 a.m. Eastern time on Friday, April 13th.
Let the record further reflect that Mr. Davoodi's deposition this morning will be taken

Page 25

engineering in rendering any opinions in this case?
A No.
Q I can strike that throughout --
A Oh, sorry. Let me rephrase. There might be some minor parts that I relied on with my mechanical background, but it wasn't -- I don't remember that they had any thing to do with the conclusion I reached.
Q Okay. As you sit here today can you tell me off the top of your head any way, shape, or form you're relying on your background in education and mechanical engineering in rendering an opinion in this case?
A As far as my opinion is concerned, no.
Q You're a professional engineer? You're a registered professional engineer in the field of fire technician; correct?
A Correct.
Q To make your deposition shorter I'm going to refer to the concept of professional engineer as "PE" during the rest of this deposition. Do you understand that?
A Yes.
Q Do you have that sort of background in any

Page 26

other area beyond fire protection?
A You meaning a professional engineering?
Q Yes, sir.
A No.
Q So you're not a professional engineer with regards to mechanical engineering; true?
A That's correct.
Q You don't have a PE in electrical engineering; true?
A That's correct.
Q I note that you're a PE registered in various states there set forth on Page 1 of your CV. Do you hold registration in any other state other than the four jurisdictions listed here?
A No.
Q So you're not a PE registered in the state of Rhode Island; true?
A That's correct.
Q Do you have any certifications in Rhode Island whatsoever?
A Note that I can recall.
Q Have you ever testified in any Rhode Island state or federal court?
A Definitely not.

Page 27

Q Have you performed any work in Rhode Island that you can remember other than your work on this particular case?
A There might have been some other cases there that I've done, fire cases.
Q Do you remember any of them as you sit here today?
A (Witness nods.)
Q That's no?
A Yes. I don't recall.
Q Are you aware of the Rhode Island licensing requirement and regulations pertaining to the work you've done in this case?
A No.
Q Are you relying upon your certification as a explosion and fire investigator in this case?
A Yes, I am.
Q When did you receive that certification?
A That was a long time ago. Again, I'm not sure but I think it was in '96; around that time.
Q Suffice it to say, that's not a certification you need to renew?
A Yes, you have to renew it every year.
Q When was the last time you renewed your

Page 28

certification as an explosion and fire investigator?
A I believe it was last year.
Q So in 2004 when you performed the work in this case, the Carvalhal case, the certification was current, to your knowledge?
A Yes, I had that certification.
Q Somewhere in your vast offices, or garage, or somewhere you've got documentation of that certification in 2004?
A I should have something somewhere.
Q Can you briefly explain to me how you go about becoming certified as an explosion fire investigator?
A You have to take a test to become certified.
Q How many times did you take that test?
A Once. As far as renewing it, I don't remember, but I think that it required continuing education hours, but that I am not sure; I don't remember.
Q Fair enough. Have you ever been subject to any professional discipline in any field of expertise upon which you're relying and rendering opinions in this case?

there was a defective product issue?
A Again, one more -- there is one more I can recall right now, which is the case of little transformers that you use for phones; you hook them up to the line and use them for the phone.
Q You're talking about an electrical converter that converts AC into current that can be used by a phone; true?
A Something like that.
Q Any other product liability cases you can remember being involved in as an investigator?
A I've done more product liability cases but I can't recall specifically as a fire investigator. But I have done one as a mechanical engineer that I can recall.
Q What was that case about?
A That case was about a faulty -- actually, it was not a faulty -- that was about a double check valve. Double check valve that apparently malfunctioned and basically screwed up the entire pump house.
Q That was for steam, or water, or what was that for?
A That was water damage, yes.



Q So we've got the toaster oven, the telephone adapter, we've got the fuse box, we've got the double check valve?
A These are the ones I remember right now.
Q The double check valve, that didn't have anything to do with a fire; true?
A No, it didn't.
Q So if you remember any other instances where you testified regarding the cause and origin of a fire regarding a defective product during the course of your deposition today, let me know.
A Okay.
Q As far as those first three we talked about where there was a fire involved, my understanding of your work as an expert on the issue of product defects occurred while you were living in Canada; true?
A I'm sorry, can you repeat that?
Q You were prior involved in origin cause and origin investigations regarding defective products, that was while you were living in Canada?
A Pre-'98.
Q Before '98?
A '98 I moved to the States.



Q It was over 10 years ago?
A Some of them, yes.
Q Describe for me your educational, professional, or other background that qualifies you to rendered any opinions regarding the alleged defect in this case.
A Well, again, I'm giving you my opinion as a fire investigator that fire started -- where fire originated. As what kind of defect that product has that was the source of the -- the ignition source, I haven't rendered any opinion on that.
Q Okay. So as I understand it, as you sit here today what you're going to render opinions about is what you saw at the Carvalhal household as far as the origin of the fire?
A Not just that but that was -- I relied on that to form my opinion, but that wasn't the whole thing.
Q Okay. Just so I'm clear, I'm an attorney, what do I know? My understanding is when it comes to cause and origin investigations, it's called cause and origin because it's two separate things; right?
A Yeah.



Q You have to establish the origin of the fire --
A First.
Q If you can't establish the origin you can't establish the cause?
A That's correct.
Q As far as the origin opinions regarding this case, that has nothing to do with the alleged defects in the water cooler; true?
A Well, the origin of the fire, that's as far as my limited expertise is the fire originated here. What was the ignition source and why the ignition source was there, I haven't rendered an opinion on that. I just said the fire started at this location.
Q When we say "this location," my understanding is that you have used your expertise to establish the geographical physical location in the Carvalhal kitchen where this fire originated; true?
A In the kitchen and in the water cooler.
Q Now, that's where I get a little bit fuzzy about the opinions you're going to render in this case. You're saying that you will testify -- you

will render opinions to Mr. Davoodi's level of certainty, whatever that may be, establishing where in the kitchen this fire started; true?
A That's correct.
Q And you also rendered opinions to Mr. Davoodi's level of certainty that there was a fire inside the water cooler; is that true?
A I rendered an opinion that where in the water cooler fire started.
Q But as far as why the water cooler ignited, you're not going to render any opinions about that; true?
A I have not, yes.
Q So all you're going to say is there was a fire in the Carvalhal's kitchen in this particular corner and there was a fire inside of the water cooler that was sitting there; true?
A That's correct.
Q You're not going to say this is why the water cooler caught fire; true?
A That's correct.
Q You're not going to render an opinion saying this is the defect in the water cooler that caused it to catch fire; true?



A That's correct.
Q You don't have any product liability opinions in this case?
A No, I don't.
Q That will make your deposition much shorter. I thank you for kind of walking me through it. Having said that, let me ask one or two more questions. I think we talked about what you remember doing product liability analysis on; do you remember?
A Yes.
Q As far as your background in that aspect of what you do, you don't remember doing such a product liability analysis involving another water cooler other than this case; true?
A I have not done any other water cooler cases.
Q This is your first water cooler case as either a cause and origin expert? I'll object to my own question -- strike it. To avoid the compound nature of what I'm going to ask you, I'll ask a better question. As a cause and origin investigator, you have not investigated another fire involving a water cooler; true?



A To my knowledge. I don't recall any.
Q As far as your other work where you were involved rendering opinions regarding product defects, you don't ever remember being involved in a case where you rendered opinions about a product defect in a water cooler; right?
A That is correct.
THE WITNESS: Can we take a little break?
MR. ELGES: Absolutely. Take a short one.
(Off the record.)
MR. ELGES: (On the record.)
Q (By Mr. Elges) I want to revisit your CV real quickly, move on with this and get on with your opinions in this case. You're currently employed by the National Fire Protection Association; true?
A That is correct.
Q They issue guidelines regarding the work that you do as a fire investigator?
A One of their guidelines is -- their business is the fire and safety business. And one of their guidelines is NFPA 921, which is like the bible for fire investigators.
Q When you say "bible" -- people rarely use the word "bible." Let me see if I can explore what



you mean by "bible." NFPA 921, those are rules that fire investigators using cause and origins investigations must follow; true?
A Not really. The NFPA 921 is a guide, it's not a standard, but it's full of good information.
Q Your supervisor back in the office in Quincy wouldn't be upset to hear you say it was only a guide?
A They shouldn't be, that's my opinion.
Q Let me ask you about your work for your current employer. Are you involved in the amendment, development, revision of 921?
A No.
Q So if you come to court you're not going to come in and say, I work for NFPA and that means that I have particular expertise in 921? You're not going to say that?
A No. No. My knowledge of 921 has nothing to do with me working at NFPA.
Q So the fact that you work for that association doesn't give you special qualifications or authority to speak about 921?
A No.
Q What do you do for the association,

generation of your report or your investigation in this case?
A No.
Q It was just you from Crawford Investigation?
A That's correct.
Q No one else involved?
A Not that I can recall.
Q Before we leave Page 15, file status notes that the file is being closed. Do you see that on Page 15, first line there?
A Yeah. Okay.
Q To your knowledge, your file at Crawford for the Carvalhal fire remained closed until you were contacted for your deposition; true?
A Until I was contacted. Mr. Loftus contacted me, I think it was a couple of months ago but I don't remember if it discussed, the position at the time. He just wanted to meet with me. I guess I don't remember very good.
Q Fair to say that until -- from the date that this report was issued until 2007 Crawford Investigations' file and your file, for that matter, remained closed?



A As far as I knew, yes.
Q I need to take you a step back and ask you about your background and experience. Have you ever been involved in the design and manufacture of a water dispenser?
A No.
Q Have you ever been involved in the design or manufacture of any product?
A I can't recall but I would say, no.
Q You were involved in the destructive testing of this unit?
A Yes.
Q Was your involvement with the destructive testing with the water cooler an issue in this case the first time you disassembled and examined a water dispenser?
A No.
Q Tell me the other occasions where you disassembled and examined a water dispenser.
A Well, after the fire I disassembled two fire -- two water dispensers, water coolers to learn from them.
Q But getting back to my question -- I think you answered my question and you've clarified your



background and experience so let me ask you another question. Other than the three water coolers that you disassembled and examined in this case, have you ever, for any reason, disassembled or examined any other water cooler?
A No, I have not.
Q I'm going to ask you some questions about what you did in this case, and I think most of your work was documented in the written report that we previous identified as your report dated September 10th, 2004.
A Okay.
Q Other than receiving a phone call from John, whose last name I'm not going to mispronounce --
A Pflanz.
Q -- did you do any work prior to your arrival to conduct your on-site visit on March 3rd, 2004?
A Prior to the site investigation did I do any work on this case?
Q Yes, sir.
A No. I just generated the worksheet and, no. I would say no.



Q When you say -- When you say "worksheet," is that something that's in your three-ring binder file or I have a copy?
A I saw a copy of it I think in one of the stuff you gave me but it's not in the report.
Q What does the worksheet have on it?
A The name of -- the file number, the name of the person that assigned -- gave us the assignment, and the contact number, the address of the place that was -- I guess, caught fire. Yeah, that's it.
Q All right. Just for the record, that's H515. It's -- is it a one-page document?
A One page.
Q It's a one-page document entitled "Acknowledgement investigation services." It doesn't contain much information at all. Other than that assignment sheet, do you recall being provided with any other information either verbally or written form --
A I don't recall.
Q -- prior to arriving to do your site inspection on March 3rd, 2004?
A I would say no.