# EXHIBIT G

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THE HARTFORD INSURANCE COMPANY
as Subrogee of ALBERTO CARVALHAL

vs. C.A. No. 06-362S

GENERAL ELECTRIC COMPANY and
MIDEA USA, INC.

DEPOSITION OF ARA D. NALBANDIAN, P.E., a Witness in the above-entitled case, taken on behalf of the Defendants, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of D'Amico & Burchfield, LLP, 536 Atwells Avenue, Providence, Rhode Island, on May 15, 2007 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF......LAW OFFICE OF STUART BLACKBURN
(Hartford) BY: ERIK LOFTUS, ESQUIRE
TWO CONCORDE WAY
WINDSOR LOCKS, CT 06096

FOR THE PLAINTIFF......D'AMICO & BURCHFIELD, LLP
(Carvalhal) BY: ROBERT A. D'AMICO, II, ESQ.
536 ATWELLS AVENUE
PROVIDENCE, RI 02909

FOR THE DEFENDANTS.....CLAUSEN MILLER, PC
BY: RODD E. ELGES, ESQUIRE
10 SOUTH LaSALLE STREET
CHICAGO, IL 60603

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

Page 6

A. Today.
Q. All right. So you saw that today before your deposition, correct?
A. Yes.
Q. You had an opportunity to meet with Mr. Loftus, true, before your deposition today?
A. No.
Q. You didn't meet with him before today's deposition this morning?
A. That's right.
Q. That's a bad question. If I ask you -- the other thing is, if I ask you a question today and you attempt to answer the question, everyone is going to assume that you understood the question; do you understand that?
A. Yes.
Q. All right. So when I ask you a question like the one I just asked, I don't catch myself, it's a bad, poorly framed question that you don't think you can answer, let me know. I'm an attorney, I've got a thick skin, it's not going to hurt my feelings. In light of that, I'm going to ask a better question. You didn't meet with Mr. Loftus to discuss this case this morning, correct?
A. That's correct.

Page 7

Q. Have you ever met with Mr. Loftus to discuss this case?
A. I have not met with Mr. Loftus to discuss this case.
Q. Have you spoken with him over the telephone to discuss this case?
A. Yes.
Q. When was the first time you spoke with Mr. Loftus regarding this matter?
A. First time was in early 2004 when he asked if we can assist him in this investigation.
Q. Okay. And during the last, say, three weeks, how many times have you spoken with Mr. Loftus regarding your deposition specifically?
A. Probably once or twice.
Q. How long were those -- how long were those couple of conversations you had with Mr. Loftus?
A. Two or three minutes.
Q. All right. So it was basically discussing the logistics of your deposition, true?
A. Yes.
Q. You didn't talk about your opinions in this case, specifically?
A. No.
Q. Have you consulted with anyone else regarding your

Page 8

opinions in this case?
A. No.
Q. Now, the document that has been previously labeled as Number 19, that was filed in December, you understand that, correct?
A. Yes.
Q. You haven't seen it until today or this morning; true? Yes?
A. Yes.
Q. Now, on Page 1, slipping on to Page 2 of this document, under the subheading Facts and Opinions to Which the Expert is Expected to Testify, you've had a chance to review that, correct?
A. Yes.
Q. Do you agree with what that sets forth as your opinions in this matter?
A. Yes.
Q. Do you have any other opinions in this case?
A. Not that I know of.
Q. Only what is on Page 1 and Page 2 of Exhibit 19, correct?
A. Yes.
Q. All right. According to Page 2 of Exhibit 19 you have no publications, correct?
A. We have some publications, but they're not in

Page 9

the way that are being referred to in this case.
Q. Okay. When you say publications, you're talking about your firm, Thielsch Engineering, quarterly newsletter?
A. No. We're talking about the publications that have been published in conferences or in an area where you have published to the outside for the public to read.
Q. Let me ask you the question this way, have you yourself ever published an article in a peer-reviewed journal?
A. Yes.
Q. Can you tell me the names of all the articles you've ever published in any peer-reviewed journals?
A. Oh, offhand, I can't recall exactly. I have very few articles that I have published.
Q. Is there a list somewhere back at your office of the articles that you have published in peer-reviewed journals?
A. Yes.
Q. I'm going to ask you provide that to Mr. Loftus and he will in turn relay it to me. Based upon your memory regarding those peer-reviewed journals, is it more than five articles that

Page 42

A. The dryer was overheated, the coil -- lint occurred in the environment, which acclimated in the fire, which caused the fire.
Q. It was a lint fire?
A. Electrical heater, the lint fire was basically the combustible.
Q. Did the electrical components of that dryer malfunction and cause the lint fire?
A. I don't recall whether it was malfunction to the degree that you would have -- beyond the cause of the fire.
Q. How about the television set?
A. The television was basically inherent arcing that caused the transformers fire.
Q. Back to the dryer, real quick. When you inspected and investigated that dryer, did you find physical evidence that the heating element had met -- had malfunctioned, caused the lint fire or not?
A. After the incident, it was very difficult to really find out.
Q. How did you render an opinion in that case, then?
A. Well, just looked at the environment, and it was basically looking at the condition of the accumulated lint when the dryer was on a functioning basis, somehow the temperatures

Page 43

ignited the accumulated lint and started the fire.
Q. As far as the space heater goes, did you identify a defect in that product?
A. I remember that it had tripped, and somehow the tripping mechanism had not deactivated the current.
Q. When you say tripped, you mean it toppled?
A. Toppled over.
Q. It went over?
A. Yes.
Q. And it was in a position that it was not designed to operate in, correct?
A. Correct.
Q. And it didn't automatically shut off, and then it caused a fire?
A. Correct.
Q. All right. So we talked about the electric dryer, the TV, the space heater. Do you remember being involved in rendering any opinions in any other residential fire cases, notwithstanding the Carvalhal case?
A. I don't recall right now.
Q. Now, in rendering opinions, generally, in residential fire cases, is there any particular literature that you find informative or

Page 44

authoritative?
A. Well, there is a fire quotation handbook, there is the fire investigation handbook. There are so many publications that people will always know how the fires start, how the fires are basically initiated, ignited and propagated.
Q. The literature you just talked about, that's kind of cause-and-origin related investigation literature, correct; or am I incorrect?
A. Generally, education in fires without giving you a cause and origin investigation.
Q. Did you do a cause and origin investigation in this case?
A. We did the cause rather than the origin.
Q. All right. And once again, in an effort to shorten up your deposition, you're not going to render any origin opinions regarding the Carvalhal fire, true?
A. We -- no, I'm not going to offer any origin testimony, except we start with the origin of the fire being the heaters -- I mean, hot water dispenser.
Q. Right. So, when you received the case, when you received the assignment from Mr. Loftus, that was your starting point, that the origin of the fire

Page 45

was this water dispenser, correct?
A. Yes.
Q. All right. And was your task essentially, to find a defect, to explain why this water dispenser caught fire?
A. Our request was to find a cause of the fire rather than the defect. We don't know whether there is defect or not. So we're not looking for a specific type of defect, except whatever the cause would be that will be defective in nature.
Q. All right. So when you got the water dispenser, you didn't assume -- strike the question.
MR. ELGES: Can I borrow your file?
(FILE PRODUCED TO MR. ELGES)
Q. I asked for your file about a month ago. I didn't have chance to see it before your deposition today. So, if you will bear with me, I just want to see what you folks have. Now, what I'm examining and what I'm going to describe for the record, so I know what it is later on, this is the entirety of Thielsch Engineering's file regarding the Carvalhal case; true?
A. No, this is my file that I have. Mike Cooney is going to testify. He has some of the laboratory work file that he has maintained, but I

am aware of those files. So it is not going to complicate the issue by saying what files do we have.
Q. So with the exception of the materials that Mr. Cooney has in preparation for his deposition tomorrow, which you understand to be related to his work in the laboratory, what I have in front of me is the entirety of Thielsch and your file regarding the Carvalhal fire, correct?
A. Correct.
Q. Looks like you got a copy of my expert's disclosure, correct, Mr. Glover?
A. Correct.
Q. It looks like you highlighted portions of it?
A. Yes.
Q. What's your take on Mr. Glover's opinions in this case?
A. He has rendered his opinion from his perspective which he has not addressed the issues we have addressed.
Q. So do you agree or disagree with his opinions, or are his opinions just different?
A. His opinions are totally different.
Q. If called to testify at the trial of this matter, are you going to say Mr. Duncan Glover's opinions



are incorrect?
A. It's incorrect, from the point of reference that we have concluded.
Q. What's the basis -- other than the fact that his findings disagree with yours, is there any other fault or disagreement you have with Mr. Glover's opinions as set forth in his three-page report?
A. I don't agree with his opinion, because he's not consistent with what the root cause is.
Q. How is it inconsistent with the root cause of the fire?
A. Because he does not address the material performance, he does not address the material performance.
Q. You also have a copy of some additional reports generated by EFI, fire investigation one, fire investigation report two. How did these reports inform your opinions in this case?
A. They don't address any, really.
Q. You're not relying on those?
A. No.
Q. All right. I'm going to ask you to look at this next document which is the Crawford investigation's report. That was prepared by Mr. Davoodi; is that your understanding or do you



know?
A. Yes.
Q. So, it's your understanding that was generated by Mr. Davoodi, correct?
A. Yes.
Q. Did you consult with Mr. Davoodi regarding your opinions in this case?
A. No.
Q. Have you seen Mr. Davoodi's deposition transcript?
A. No.
Q. How are you relying upon Mr. Davoodi's work in this case in rendering your opinions, or another way to put it, what aspects of the Crawford investigation's report are so crucial to your conclusions in this case that if you did not have them, you could not render any opinions?
A. The important fact is that my knowledge of being the origin of the fire is basically confirmed with Crawford's report.
Q. I'm not quite sure what you're getting at there. I'll rephrase the question. Did you review the Crawford report before you rendered your report?
A. No.
Q. You did not?
A. No.



Q. When did you first receive this?
A. Recently.
Q. When you say recently, what do you mean? Let me ask a better question. Did you receive a copy of this report before you issued your report dated September 29, 2004?
A. No.
Q. So Mr. Davoodi is just wrong?
A. I didn't say he's wrong.
Q. No, it's a hypothetical. Let me finish it. If Mr. Davoodi is incorrect, if his report is flawed, how does that impact your opinions in this case?
A. It doesn't impact my case by virtue of what we have found is basically inherent in the cause of the malfunctioned performance.
Q. You're not relying in any way, shape or form on the opinions rendered by Mr. Davoodi as set forth in the Crawford investigation's report; is that correct?
A. We -- I'm not relying on his detailed aspect of it, how he's describing it. I'm just making the reference that having the origin of the fire at the dispenser is basically my starting point. If he comes to render an opinion that sort of readdresses that issue in a way that reconfirms

that it is basically -- I am aware that he is basically making the same statement that the origin of the fire was at the hot and cold dispenser.
Q. And that's what you were told going in, correct?
A. It wasn't told to me. It was basically the statement at the time when we were investigating at the fire marshal's office.
Q. All right. At that point in time, you came to conclude -- well, let me start again. Maybe the best way to do this is to have you take a look at your report. On Page 1 of your report under introduction, the second sentence is "General Electric's water dispenser that was present in the kitchen of the residence was identified as the probable source of the fire." Do you see that?
A. Yes.
Q. Who told you?
A. That was the fire marshal's investigation on May 7th.
Q. So, you wrote that in this report as to what the fire marshal told you, correct?
A. Well, I don't know whether it was the fire marshal. We were all in a group, so I can't identify the person exactly who told and who



listened, but everybody was there to hear that the dispenser was the source of the fire at the time.
Q. So you don't know who told you that?
A. I don't remember specifically.
Q. All right. So, in a way, I guess, don't you have to rely upon Mr. Davoodi's report?
A. Well, I have to rely on the fire marshal, the fire department and the people who are basically doing the investigation to bring it out, a component that is subject of a fire.
Q. So, if the fire department wrote a report that says the source was unknown, then you would have to assume the source is unknown?
A. If that was the case, and they did not have any component that has been extracted from the fire and brought in as an exemplar saying this is the source, why would you investigate something which is not the source of the fire?
Q. To rule it in or rule it out, I guess.
A. True. It is rule in or rule out. If it doesn't show any reason that it has a potential for initiation of the fire, you can rule it out. That was our mission.
Q. I just want to make sure I understood what your mission was.



A. Basically to find whether that heater, cold water/hot water heater was really the source of the initiation.
Q. All right. And you wrote your report without seeing what Mr. Davoodi's investigation was, correct?
A. Yes.
Q. Now, if Mr. Davoodi's report would have come back and said I've looked at this coffee maker, and I think the coffeemaker was the source of the fire, how does that impact your opinions?
A. Well, if he has a coffeemaker that I haven't seen and he doesn't show any remnants, you're wrong.
Q. So, you haven't seen the coffeemaker from the Carvalhals' kitchen, correct?
A. No.
Q. You haven't seen the mixer from the Carvalhals' kitchen?
A. Yes, I have seen the mixer.
Q. Oh. Tell me about your examination, evaluation of the mixer?
A. It was involved in the fire.
Q. Did you examine it and rule it out as a potential cause of this fire?



A. Yes.
Q. How did you do that?
A. Physically.
Q. Explain to me step-by-step. Remember we talked about the protocols for assembly of a water dispenser. I want to know your protocol step-by-step how you rule out the mixer that was taken from the Carvalhals' house as a potential source of this fire.
A. Well, you look at the components that they sent you. If there is an induced fire that has damaged the component, then, naturally, it is why it has affected the component. But if there are any arcing, shorts or something that gives you the electrical initiation, then you would be investigating that kind of protocol. In this case when you don't see anything, well, naturally it is not of interest to pursue something which has been involved in the fire.
Q. All right. So, explain to me how you applied that protocol in ruling out the mixer as a potential cause of the Carvalhal fire?
A. Visual examples, physical, basically.
Q. You had to take the mixer and physically examine it, correct?

A. Yes.
Q. And based upon your physical examination of it, you ruled it out as a cause of this fire, true?
A. Yes.
Q. All right. Did you disassemble it?
A. No.
Q. Did you look at the cord?
A. Yes.
Q. And you had to do all that to rule it out as a plausible source of this fire, true?
A. Yes.
Q. All right. Did you do that with -- you didn't do that with the coffeemaker, right?
A. I don't have any coffeemaker.
Q. So you didn't do that same physical examination to rule out the coffeemaker that was in the Carvalhals' house as a potential source of the fire, true?
A. That's right.
Q. And the same is true of the television set that was in the Carvalhals' kitchen. Had you had an opportunity to evaluate and rule that out as a potential source of this fire?
A. No.
Q. The only appliance that you had an opportunity to



evaluate and review as part of your investigation was the water cooler, correct?
A. Because -- yes, that's true.
Q. Tell me about your first involvement in this case.
A. It was in 2004 when Mr. Loftus asked that they have a fire damage component at the fire department that he wanted me to do a physical examination to see what we can do. So, I had to go to East Providence Fire Department to know what it is, and they said it was the fire marshal and eventually at the fire marshal's office in North Kingstown we had a group of people who were basically there to physically examine, visually, and photographically document to see what is wrong with the component.
Q. All right. When you say component, we're talking about the water dispenser?
A. Correct.
Q. You can call it a component, I just want to establish later on, when you say component, it's a water dispenser, and when I say water dispenser, it's the same thing as the component. Before I leave the issue of your file, that's it, right? Well, to be fair, there is some correspondence in here, there is some E-mails back and forth between



you, Mr. Loftus and Mr. Cooney, and then your written report which we've talked about as being the one dated September 29, 2004. That's all your file, right?
A. Yes.
Q. You got no handwritten notes, right?
A. That's right.
Q. You got no measurements?
A. No.
Q. There is some photographs in your report?
A. Right.
Q. There's no literature in this file that you relied upon in this case?
A. That's correct.
Q. There's some test results in this case, right?
THE WITNESS: What kind of test results?
Q. Well, in your report, you talk about -- tell me about the testing you did in this case?
A. Testing is basically metallurgic evaluation.
Q. So you did some visual testing using some high magnification, correct?
A. That's physical examination, yes.
Q. Then you took a sample of the insulation, you did, for lack of a better way to put it, a study to



determine its composition, correct?
A. Yes.
Q. That's all the testing you did, correct?
A. Metallurgical evaluation is basically material condition, microstructural characteristics to see how the material has responded under the operating condition, why the degradation and what are the effects between the chemical composition of the metal versus the chemicals that are detected on the surface is external or internal.
Q. Let me ask the question this way. If your firm, Mr. Cooney, or yourself did any testing of this unit, it is detailed and explained in your report dated September 29, 2004, correct?
A. Yes.
Q. If it's not in there, it didn't happen, true?
A. That's right.
Q. There are no other notes that I haven't seen, correct?
A. I don't believe so.
Q. All right. You didn't do an independent investigation at the fire scene, correct?
A. No.
Q. Never been to the Carvalhals' household, true?

Page 110

A. That's the second letter. We had obtained it from someone or somebody gave it to us. I have to check on that one.
Q. So you don't know one way or another where that's from?
A. Correct.
Q. Do you know one way or the other whether that's the owner's manual that came with the water dispenser that was at the Carvalhals' kitchen on the day of the fire?
A. I don't know.
Q. I want you to look at the owner's manual up in the front, somewhere in the caution section there is mention about properly plugging this unit in. Let me know when you've found the information regarding the requirements for plugging this unit into the wall socket.
(PAUSE)
Q. If you look at Page 3.
A. I have Page 3 over here.
Q. Grounding instructions, the second full paragraph, what does that indicate?
MR. LOFTUS: Objection.
A. "For best operation, plug the appliance into its own outlet on a dedicated circuit to prevent

Page 111

flickering of lights, blowing of the fuse or tripping of circuit breaker."
Q. The paragraph I'm interested in reads as follows, let me know when you see where I'm talking, "This appliance is equipped with a power cord" --
A. "Having a grounding wire with a grounding plug. The plug must be plugged into an outlet that is properly installed and grounded."
Q. Do you know one way or another whether or not this particular unit was plugged in in that fashion?
A. No, I don't.
Q. Do you have any information or other basis for drawing any conclusions regarding the manner in which this water dispenser was plugged into the wall in the Carvalhals' kitchen at the time this fire occurred?
A. I don't know.
Q. Are you able to rule out with scientific certainty that this fire did not originate at the wall socket where this unit was plugged in?
A. I can't rule out, I can't rule in. I don't know anything about the site investigation that was conducted by the fire department or somebody else.
Q. All right. Fair enough. But you will agree that

Page 112

it's important to follow a manufacturer's instructions when installing and using an electrical appliance, true?
A. Yes. That's a requirement, as the manufacturer says, otherwise they deny it.
Q. Well, let me ask you the question again, maybe I can get a straight answer. It's important that when you're utilizing an electrical appliance, that you follow manufacturer's instructions, true?
A. Yes.
Q. All right. One of the reasons that it's important to follow them is if you don't follow those instructions, you could cause a fire, true?
MR. D'AMICO: Objection.
A. That's over -- if you don't, you don't know what happens, that's the unknown.
Q. The appliance could malfunction?
A. Correct.
Q. Now, getting back to your initial evaluation of the unit, there is a narrative in your report -- let me take a step back. If you look at the first page, I'm going to ask you to use mine just so I have a copy of what you're testifying about. If you look at the first page of your report, it says it's a preliminary report; do you see that?

Page 113

A. Yes.
Q. Did you ever generate a final report?
A. No.
Q. Why is this report marked "Preliminary"?
A. Because it was, at the time, given in September 2004. Potentially, if there was any other significant that expected to revise or do any investigation farther than what we had done.
Q. So there is no report marked final report?
A. That's correct.
Q. When you issued this report on September 29, 2004 did you think that there was additional work that you and Mr. Cooney needed to do in this case?
A. Well, naturally, when you have a case where there may be other upcoming information that is potentially -- it doesn't finalize. You put preliminary just as a matter of knowing that a case is not finished until somebody says, well, this is the extent of the investigation that is going to occur.
Q. So when you issued this report on September 29, 2004, you didn't inform whoever was receiving the report, we should do this other additional investigation, correct?
A. No.



www.AlliedCourtReporters.com ALLIED COURT REPORTERS, INC. (401)946-5500 or (888)443-3767

Page 114

Q. All right. So you did inform them they needed to do some additional investigation or work on this case?
A. There wasn't any need for us to investigate farther because we had determined the probable cause of the failure.
Q. Okay. And you subsequently received a copy of Mr. Davoodi's report issued through his office at Crawford investigations, correct?
A. Yes.
Q. And you have had an opportunity to review that report prior to your deposition today, correct?
A. Yes.
Q. Do you disagree with any of the conclusions, assertions or methodology that Mr. Davoodi used in his reaching his opinions in this case?
A. I don't have any disagreement. He just made the -- his information available for our review in providing us some of the observations that he has made, and we were not aware what was his, basically, expression of what he found.
Q. So, you don't agree or disagree with what he said, then?
A. Well, the only thing that is in agreement with us, that he identifies the water heater as

Page 115

the origin of the fire.
Q. Okay. And you reached your conclusion before you saw his conclusion, correct?
A. Correct.
Q. So, if he had reached the conclusion that, no, a coffeepot in the corner of the Carvalhal kitchen was the source of the fire, would you still hold your opinions as set forth in Defendants' Exhibit Number 20?
A. Yes.
Q. Now, your report indicates on Page 3 of that first paragraph, it reads, "The source of the fire was not evident from the initial visual examination, therefore, it was recommended that destructive laboratory examinations be performed on the water dispenser to establish the source and possible causes of the fire." Correct?
A. Yes.
Q. So, as of May 7th, you couldn't tell one way or the other whether or not a fire had initiated within this water dispenser, correct?
A. That's correct.
Q. You needed to do additional testing, which you subsequently did, correct?
A. Yes.

Page 116

Q. What date did you perform that subsequent laboratory investigation of this unit?
A. Destructive testing was performed on a later date, I believe in June, and I don't have the specific date. The examination according to Mr. Gregory Giel's report.
Q. You're looking at a report from EFI, who is my expert?
A. He was attending, so I knew it was in June, but he said that he attended on June 29th.
Q. All right. So assuming for the moment that my expert knows what date this destructive testing occurred, that's the date it occurred. I'm going to ask you to separate your narrative from the photographs because I'm going to walk through your photographs and we'll talk about what you observed during that destructive testing. What is the first figure which documents your destructive testing of this?
A. Figure 11.
Q. What does figure 11 depict?
A. Figure 11 depicts the dispenser that we had received in the laboratory before we started the testing.
Q. So these are the before, as it were, photographs

Page 117

which depict the condition as the unit was received in when it came in from the State Fire Marshal's office, correct?
A. Yes.
Q. And the purpose of these photographs was to document that condition? True?
A. Yes.
Q. And based upon these photographs, this shows you what you could see when you did your visual inspection of this unit on May 7, 2004, correct?
A. Basically, the orientation of some of the components which were replaced, as you refer to figure 1 and 2, they have some of the parts put in there, the lower compartment, and they had taken it and put it on top of the compartment. It's just documenting the as-received and what was seen on May 8th.
Q. The initial photographs which just depict the outside of the unit, they don't inform your opinions in this case, because you had already seen them when you were looking at the unit back in May of '04?
A. Correct. It shows the photographs in such a way that it represents the condition as existed prior to taking some of the inner components of

Page 182

has the balance of it, because the balance of it referred to his testimony, true?
A. Yes.
Q. So between your version of the file and the other version Mr. Cooney is going to bring tomorrow, I will have seen the file in its entirety; true?
A. I believe so.
Q. Did you have an opportunity to review what was in Mr. Cooney's file prior to your deposition today?
A. No, not yet.
(DEFENDANTS' EXHIBIT 23 MARKED FOR IDENTIFICATION)
Q. I'm going to ask you to look at Defendants' Exhibit 23, while you're flipping through this, let me just identify what I think it is. It looks like it's part of the NFP fire analysis and research document, quote, "U.S. Home Product Report Appliances and Equipment, 1/02." There is some other documents further in this exhibit all dealing with the same subject, apparently, all from the same source. Have you ever seen that document before?
A. No. We have never been provided with this.
Q. You're not relying upon that document or any information contained therein in reaching your

Page 183

opinions in this case, correct?
A. I haven't seen this document to take it into consideration. What is it?
MR. ELGES: That's what I want to know. I'll ask Mr. Cooney.
Q. Have you been asked to perform any additional work on this file?
A. Not to my knowledge.
Q. Can you think of any additional work that you can perform that would --
A. I don't know. If somebody asks me, I'll answer the question.
Q. Well, I'll ask you. Could you test the temperature sensor switches on the side of the Carvalhals' unit to see if they work?
A. I don't know.
Q. Could you test the temperature sensor switches on the side of the water dispenser with fiber insulation to determine how they work?
A. They would work either on or off. How is different to answer? Internally, the functionality performance. You have to give the designers characteristics in order to verify how they work.
Q. But another way to figure out how they work under

Page 18

normal circumstances would be to take them apart and look at them internally, true?
A. No. If you take it apart, they will never work.
Q. That's a good point. But if you took them apart, you would know how they were working before you took them apart, right?
A. Well, they give you the design, you would know, anyway. You don't have to take it apart.
Q. Same question with regard to work that could have been done or could be done, I guess, you could take the water dispenser unit with the fiber insulation and test to see how hot the heating element got under normal conditions, true?
A. You can equip the components to measure the temperatures.
Q. Okay. And you could examine, otherwise take samples of the plastic components of the fiber water dispenser unit to determine what sorts of plastics they were or are? True?
A. You could do a lot of things if you got the money to spend.
Q. Exactly. I want to ask you to look at Page 7 of your report real quick, the paragraph that starts "Metallurgical examination," Page 7 of your

Page 18

narrative.
A. Okay.
Q. The second paragraph from the bottom talks about metallurgical examination. Buried in that paragraph the following sentence reads, "The quality of the nozzle top joint of the hot water tank could not be determined." Correct?
A. Yes.
Q. You also go on to note, "That two probable causes of leakage from the hot water was from the top nozzles, due to a faulty braze joint or inadequate sealing of the rubber tube." Do you see that?
A. Yes.
Q. Did you come to a conclusion one way or the other to a reasonable degree of scientific certainty as to what the cause of the initial leaking of water was?
A. You have to defer that metallurgical aspect to Mike Cooney to give you that better answer.
Q. Before I let this go, another possible source, reading in the same paragraph, another possible source of water could have been above the hot water tank/heater such as from the cold water tank or a leak in the potable water supply line to the water dispenser; do you see that?



www.AlliedCourtReporters.com ALLIED COURT REPORTERS, INC. (401)946-5500 or (888)443-376