# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

THE HARTFORD INSURANCE COMPANY,
AS SUBROGEE OF ALBERTO CARVALHAL

VS C.A. NO. 06-462S

GENERAL ELECTRIC COMPANY AND
MIDEA USA, INC

DEPOSITION OF MICHAEL COONEY, a witness in the above-entitled cause, taken on behalf of the Defendants, before Barbara Warner, RPR, Notary Public in and for the State of Rhode Island, at the offices of D'Amico & Burchfield, 536 Atwells Avenue, Providence, RI, on May 16, 2007, at 10:00 A.M.

APPEARANCES:

FOR THE DEFENDANTS . . . . . . . . CLAUSEN MILLER, PC
BY: TODD E. ELGES, ESQUIRE

FOR THE PLAINTIFF. . . . . . . . . LAW OFFICE OF STUART BLACKBURN
BY: ERIK LOFTUS, ESQUIRE

FOR THE PLAINTIFF . . . . . . D'AMICO & BURCHFIELD
BY: ROBERT A. D'AMICO, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND
401-946-5500

Page 2

INDEX


WITNESS PAGE

MICHAEL COONEY

EXAMINATION BY MR. ELGES................ 3
EXAMINATION BY MR. LOFTUS............... 193
RE-EXAMINATION BY MR. ELGES............. 196


EXHIBITS


NO. DESCRIPTION (DEFENDANT'S) PAGE

27. DEPOSITION NOTICE....................... 3
28. UPDATED DEPOSITION TESTIMONY............ 46
29. PACKET OF PHOTOS........................ 189
30. FAX COVER SHEETS........................ 189


*ALL EXHIBITS RETAINED BY ATTORNEY ELGES

Page 3

(DEPOSITION COMMENCED AT 10:10 A.M.)
MICHAEL COONEY
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your name and spell your last name for the record.
THE WITNESS: Michael Cooney, C-O-O-N-E-Y.
EXAMINATION BY MR. ELGES
MR. ELGES: Mark this as Defendant's Exhibit 27.
(EXHIBIT 27 MARKED FOR IDENTIFICATION)
Q. Let the record reflect this will be the discovery deposition of Mr. Michael Cooney taken pursuant to subpoena. Let the record also reflect Mr. Cooney's deposition will be taken in accordance with the Federal Code of Civil Procedure and any applicable local court rules. Have you been deposed before?
A. Yes.
Q. How many times?
A. I believe six. I included a list of all of my prior depositions in the file.

Page 4

Q. Thank you very much. And you have been deposed primarily in the context of you being a retained expert to testify in litigation, true?
A. Yes.
Q. By virtue of your prior experience with depositions, I am going to give you a short version of ground rules for taking a deposition just to refresh your recollection about how the process is going to work today. As you can see, we have a court reporter here. She is doing her best to take down everything we are saying. In light of that, I will try to speak slower than I normally do and keep my voice out load and clear. To the degree you can do that, that will help her today. The court reporter is good, but she can only take down once person at a time. I will do my best not to cut off your answer before you finish them and pay me the same courtesy of not cutting off my questions before I've finished, even if you know where I am going. During the course of everyone's deposition, just about every witness

Page 37

Q. I understand the first part of that against, which is no. The second part of it is a little bit fuzzy. As far as your work on the Carvalhal case, my understanding is that you did not go to Thielsch's library, the internet or a colleague or anyone else to obtain literature to review before you came to your opinions, true?
A. True.
Q. And your second part of the answer is making reference in all of your education and experience, you have reviewed various documents, including a metallurgical text book back in Indiana at Notre Dame that you reviewed and that became part of your base of information to render opinions generally regarding metallurgical issues; that is what you are getting at, right?
A. Right, but I didn't review it 20 years ago, as you alluded to.
Q. When you rendered cause and origin opinion in the Florida Power case, do you recall relying upon any literature, text books, peer review publications as a foundation

Page 38

for your opinions in this case?
A. No.
Q. Now, looking back at Exhibit 27, we have already established you did not see this document before this morning, so I am going to ask you to take a look at Mr. Loftus' disclosure regarding your opinions in this case, which starts on the bottom of Page 1 and continues on to Page 2. Once you have reviewed that, let me know.
(WITNESS PERUSES DOCUMENT)
A. Okay.
Q. Does this disclosure set forth in that exhibit, completely and accurately set forth in general terms the opinions you intend to render if this matter goes to trial?
A. Yes.
Q. The way I break it down is you are going to have the opinion that the GE or the Carvalhal water dispenser located in the kitchen of their residence was the cause of the fire on February 27, 2004?
A. Yes.
Q. What is the basis of that opinion?

Page 39

A. That is presented in our report, the laboratory examination testing we did, as well as the on site, the inspection of the water cooler that Mr. Nalbandian performed at the fire marshal's office.
Q. Just so I understand, and we agree that I understand, and a judge will understand, you're rendering a causation opinion regarding the water cooler in this case, you are not rendering a fire origin opinion in this case, is that true?
A. Yes.
Q. And just to drive home the point, in the Florida Power case you did both, you did a cause and an origin opinion in this case, and the origin aspect of that opinion was based upon your firsthand observation of the fire scene and your evaluation of the evidence on a nearby stainless steel surface and that enabled you to pinpoint the origin as it were of the Florida Power fire, true?
A. Yes.
Q. And you went on to do a separate cause evaluation of that fire and determined it

Page 40

was related to welding malfunctions of some sort, true?
A. Yes.
Q. You have not done the origin investigation of the Carvalhal fire and you do not intend to offer any origin opinion in the Carvalhal case, true?
A. Correct.
Q. As far as the cause opinions you intend to offer in this matter, the foundation for saying is either identified or at least referenced in the reports in the file in front of us, true?
A. Yes.
Q. The second opinion I see here is later on in that same paragraph, the water dispenser was not properly designed. Can you explain to me what you mean by or explain to me what opinions you intend to render on that particular issue?
A. Yes. The use of thermal insulation, the foam insulation containing chlorides on a stainless steel surface where there is potential for water to contact that insulation at temperatures above

Page 81

measurements or anything else relating to the destructive testing in your file or anywhere else, for that matter?
A. No, no notes. There were additional EDS spectra that were typical of the ones we gathered that are including in the report. Additional EDS spectra that would not necessarily be in the report. Other than that, there are no notes, everything is included in the report.
Q. During your work with the destructive testing or any other aspect of the work you did in this case, did you take handwritten notes?
A. Not that I recall, nothing extensive. Most of it is visually documented and/or recorded with our equipment.
Q. If there were notes or other independent documentation of your observations or work in this case, those separate documents we don't have would have been destroyed as a matter of course and hopefully any information contained therein would have been incorporated into your report dated September 29, 2004, correct?

Page 82

A. Yes.
Q. In looking at that report, I note that it is labeled preliminary; do you see what I am talking about? For purposes of this aspect of your deposition, I will ask you to look at what has been previously labeled as deposition Number 20, which is Thielsch's report regarding this case dated September 29, 2004. Do you see on Page 1 of that report where it says preliminary?
A. Yes.
Q. Did you prepare the cover sheet or is that one else's job?
A. Typically I would. I don't recall if I did.
Q. Do you know why this particular report on this date was determined to be a preliminary report?
A. We typically do that for investigations like that where there is a potential for new information to become available in the future.
Q. An example of new information becoming available would be your receipt of certain evidence from Mr. Davoodi, more

Page 83

specifically, exemplar water dispenser number 1? The mixer and the outlet, that would be an example of getting information after your evaluation had been done, true?
MR. D'AMICO: Objection.
A. Yes.
Q. And did you revise your September 19, 2004 report in any way, shape or form to reflect your receipt of that additional information?
A. No, we have not.
Q. I think I asked you this before, and forgive me for asking again, your receipt of that additional physical evidence did not impact or change your opinions as set for the in this report, true?
A. Correct.
Q. In this case, are you aware of any report being issued labeled as final?
A. No.
Q. Have you been asked to perform any additional work on this case?
A. Not by our laboratories. I physically went to an Analytical Answers in December of 2006, which is a laboratory that

Page 84

performed the EDS analyses on the insulation sample requested by Dunkin Glover, but our laboratory has not performed any additional work.
Q. Since this report was issued September 29, 2004 with Mr. Loftus' consent and cooperation, my expert, Mr. Duncan Glover, collected some samples in this case, true?
A. True.
Q. I will separate anything that Mr. Duncan Glover has done in this case and talk about anything you and Mr. Nalbandian and anyone else at Thielsch has done since this report was issued in September of 2004. Have you, or to your knowledge Mr. Nalbandian, or anyone else done work on that case?
A. Other than visual examination of the exemplar water cooler and visual examination of the mixer and outlet, no, we have not done any additional work.
Q. Other than that additional information have you received, any other additional information from any source pertaining to the Carvalhal fire since this report was issued?

Page 85

A. Yes.
Q. What else did you receive?
A. We received Mr. Davoodi's report, the report from Duncan Glover, and another expert, and I don't know his name. I think Calenda was the last name.
Q. I will rely on Mr. D'Amico to pronounce that name properly. You referred to Vinny Calenda, I mutilated that name. Mr. Calenda is the defendant's cause and origin investigator; is that your understanding?
A. Yes.
Q. So you have reviewed materials provided to you regarding what the defendant's experts have seen and concluded in this case and the other evidence that you just told me about; did any of that evidence impact or change your opinions in this case?
A. No.
Q. Did Mr. Loftus give you any other additional information since this report has been issued in 2004?
A. No.
Q. Did Mr. Loftus give you any thing produced

Page 86

by the defendants in this case. Strike that question. My clients, Midea and General Electric, responded to written discovery questions propounded on behalf of Hartford. Have you seen any of the information that either of the defendants provided to Mr. Loftus in response to those inquiries?
A. I am not sure what those inquiries were, so I don't know.
Q. Putting a finer point on it, would it be fair to say if you had received that information from Mr. Loftus, it would be in your file?
A. Yes.
Q. Did you ever see a wiring diagram for this unit?
A. Not that I recall.
Q. Would it surprise you to learn the defendants produced a wiring diagram to Mr. Loftus and it had not been passed on to you for evaluation?
A. No.
Q. That wouldn't surprise you?
A. I would like to see it, but it does not

Page 87

surprise me.
Q. Why would you like to see it?
A. To have as much information as possible.
Q. The way I am going to do this is walk you through the report, if that is okay?
A. Yes.
Q. And it is labeled Exhibit Number 20?
A. Yes.
Q. When I talk about the report, I am talking about Exhibit Number 20 dated September 29, 2004, agreed?
A. Yes.
Q. On Page 1 under introduction, "A general electric water dispenser that was present in the kitchen of the residence was identified as the probable source of the fire." Do you know the source of that information?
A. I believe that was information provided to us by Mr. Davoodi.
Q. Now, did you write this report, did Mr. Nalbandian write this report, was it a collaborative effort; how did this come to exist?

Page 88

A. It was a collaborative effort.
Q. Other than Mr. Davoodi, to your knowledge, there was no other source for the claim that the Carvalhal water dispenser was the probable source of this fire, correct?
A. Correct.
Q. It talks in Page 2 of the report about Appendix A and B. I will ask you to look at what has been labeled as Defendant's Exhibit 29, which is those two appendices. During the break, you had a chance to flip through that exhibit and you confirmed, I believe, those appear to be the same appendices to, those appear to be true and accurate copies of the appendices to the report previously identified as Exhibit 20, correct?
A. Correct.
Q. The photographs in Appendix A, do you know where those came from?
A. I believe they were taken by Mr. Davoodi and provided to us.
Q. Are your opinions based upon those photographs in any way, shape or form?
A. More Mr. Nalbandian's than mine. I