# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| THE HARTFORD INSURANCE COMPANY, as Subrogee of ALBERTO CARVALHAL<br>*Plaintiff*<br><br>Vs.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br>*Defendant* | No.CA:06-362S |
| EUGENIA CARVALHAL<br>*Plaintiff*<br><br>Vs.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br>*Defendant* | No.CA-07-007S |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF, EUGENIA CARVALHAL'S, OBJECTION TO MAGISTRATE JUDGE ALMOND'S REPORT AND RECOMMENDATION ON THE DEFENDANTS' MOTION TO PRECLUDE THE PLAINTIFF'S EXPERTS AND FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, Eugenia Carvalhal, by and through her attorneys, and joins in and incorporates by reference the arguments set forth in the Memorandum of Law in Support of its Objection to Magistrate Judge Almond's Report and Recommendation on the Defendant's Motion to Preclude Expert Witness and for Summary Judgment (hereinafter "Report") of co-plaintiff, The Hartford Insurance Company, as if fully rewritten herein. Plaintiff also relies on the arguments set forth herein in further support of her Objection to Magistrate Judge Almond's Report.

Pursuant to Local Rule 7(e), Plaintiff requests a hearing for oral argument which Plaintiff estimates will require twenty minutes time. In the alternative, if this Court does not reverse

Magistrate Almond's report, Plaintiff contends that an evidentiary hearing at which Plaintiffs' experts can testify regarding the scientific basis of their opinions is required.

## FACTS AND TRAVEL

On June 8, 2007, the Defendants filed a Motion to Preclude Plaintiffs' Experts and for Summary Judgment. Plaintiffs filed a timely objection and oral arguments were presented on September 14, 2007 before of Magistrate Judge Almond. On October 2, 2007, Magistrate Judge Almond filed his Report, recommending that the testimony of Plaintiffs' causation experts, Ara Nalbandian and Michael Cooney, be precluded and, further, that summary judgment should enter in favor of the Defendants. This objection followed.

## ANALYSIS AND ARGUMENT

### A. THIS COURT SHOULD REVERSE THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE ALMOND BECAUSE THE PLAINTIFF'S EXPERTS WITNESSES ARE QUALIFIED TO PROVIDE EXPERT TESTIMONY

The *Daubert* Court formulated a regime for use in ascertaining the admissibility of expert scientific evidence under Fed. R. Evid. 702.[1] See also *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188. This regime contemplates that trial judges will perform a gatekeeping function, determining "whether the reasoning or methodology underlying [proffered expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; *see United States* v. *Sepulveda*, 15 F.3d 1161, 1183 (1st Cir. 1993) (discussing this function).

By way of guidance, the Rhode Island Supreme Court has held that "before admitting expert testimony, the trial justice must evaluate whether the testimony that a party seeks to present to the jury is 'relevant, within the witness' expertise, and based on an adequate factual

---

[1] [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise.

foundation." *Kurczy v. St. Joseph Veterans Assoc.*, 820 A.2d 929, 940 (R.I. 2003) (quoting *Rodriquez v. Kennedy*, 706 A.2d 922, 923 (R.I. 1998) (per curiam)).

In *DiPetrillo v. Dow Chemical Co.*, the Rhode Island Supreme Court discussed the standard for admitting scientific testimony that should govern the trial court's decision about whether to allow the jury to hear this type of evidence. *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 686 (R.I. 1999). Although the court in *DiPetrillo* declined to expressly adopt the standards outlined by the United States Supreme Court in *Daubert*, the court drew guidance from the principles of that case. *Owens v. Silvia*, 838 A.2d 881, 890 (R.I. 2003) (citing *DiPetrillo*, 729 A.2d at 686).

In *Daubert*, the Court held that, under the Federal Rules of Evidence, a trial justice, in admitting expert testimony, acts as a "gatekeeper" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but [also] reliable." 509 U.S. at 589. Guided by *Daubert*, the Rhode Island Supreme Court held in *DiPetrillo* that when a party seeks to introduce novel or complex technical evidence through expert testimony it is proper for the trial justice to exercise a gatekeeping function.[2] 729 A.2d at 685. "The primary function of the trial justice's gatekeeping role is to assure that the proposed expert testimony, presented as a scientifically valid theory, is not mere 'junk science.'" *Owens*, 838 A.2d at 891. The trial justice must ensure that any expert testimony presented to the jury is based on ostensibly reliable scientific reasoning and methodology. *Id.* (citing *DiPetrillo*, 729 A.2d at 690). In sum, a trial justice may admit expert testimony "only if the expert proposes to testify 'to (1) scientific knowledge that (2) will assist the trier of fact.'" *Id.* (citing *DiPetrillo*, 729 A.2d at 687).

In addressing the first part of this two-part inquiry, often referred to as the "reliability" test, the trial justice examines four non-exclusive factors in determining whether expert testimony

---

[2] Adopting the holding of the United States Supreme Court in *Kumho Tire*, the Rhode Island Supreme Court, in *DiPetrillo*, held that the trial justice's gatekeeping duty applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical and 'other specialized' knowledge." 526 U.S. at 141.

about novel or technically complex theories or procedures possesses scientific validity. *In re Mackenzie C.*, 877 A.2d 674, 683 (R.I. 2005); *but see Owens*, 838 A.2d at 891 ("Four non-exclusive factors can be helpful in determining if expert testimony about novel or technically complex theories or procedures possesses scientific validity."). These factors are:

> (1) whether the proffered knowledge has been or can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the scientific community.

*Owens*, 838 A.2d at 891 (quoting *DiPetrillo*, 729 A.2d at 689). The *DiPetrillo* Court held that **"satisfaction of one or more of these factors may be sufficient to admit the evidence and each factor need not be given equal weight in the analysis."** *Id.* (Emphasis added). **"The court may also consider the qualifications of the expert in determining whether the underlying methods are reliable."** *Id.* (Emphasis added). Importantly, however, especially when the proffered knowledge is neither novel nor highly technical, satisfaction of one or more of these factors is not a necessary condition precedent to allowing the expert to testify." *Id.*

In addressing the second part of this inquiry, the trial justice evaluates "the relevance of the proffered testimony in assisting the trier of fact to understand the evidence or to determine a fact in evidence." *DiPetrillo*, 729 A.2d at 689. To be admissible, the expert opinion must be "sufficiently tied to the facts of the case that it will aid the [fact-finder] in resolving a factual dispute." *In re Mackenzie*, 877 A.2d at 684 (quoting *Owens*, 838 A.2d at 891). In other words, the testimony must fit an issue in the case. "If the testimony 'logically advances a material aspect of the proposing party's case,' .... the court may deem it relevant and admissible." *Id.* "Once an expert has shown that the methodology or principle underlying his or her testimony is scientifically valid and that it 'fits' an issue in the case, the expert testimony should be put to the trier of fact to determine how much weight to accord the evidence." *DiPetrillo*, 729 A.2d at 689-90 (citing *Ambrosini v. Labarraque*, 322 U.S. App. D.C. 19, 101 F.3d 129, 134 (D.C. Cir. 1996)). "The task of assigning weight, if any, to the opinion of an expert witness, is reserved for the jury."

*Beaton v. Malouin*, 845 A.2d 298, 302 (R.I. 2004). The "jury is free to accept or reject expert testimony in whole or in part or to accord it what probative value the jury deems appropriate." *Owens*, 838 A.2d at 890 (quoting *Morra v. Harrop*, 791 A.2d 472, 476-77 (R.I. 2002)). **"Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."** *Id.* at 892 (quoting *Daubert*, 509 U.S. at 596). (Emphasis added).

In his Report, Magistrate Judge Almond relies on guidance from two major cases, namely *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77 (1998) and *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184 (1997). Though these cases are not factually parallel to the facts at issue in the case at bar, these cases set forth the legal framework that is used to analyze the admissibility of expert scientific evidence; specifically the prejudice that comes with ***excluding*** scientific evidence. It is important to note that in both of these cases, the decision of the trial justice was to exclude the expert testimony and that the decisions of the respective trial justices in those cases were reversed by the United States Court of Appeals for the First Circuit.

In the case at bar, Magistrate Judge Almond brings to light the reasoning of the *Ruiz-Troche* Court, which stated that *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. 161 F.3d at 85. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," *Daubert*, 509 U.S. at 590 (internal quotation marks omitted), **it should be tested by the adversary process -- competing expert testimony and active cross-examination -- rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies**, *see Id.* at 596. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. *Ruiz-Troche,* 161 F.3d at 85. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically

sound and methodologically reliable fashion. *See Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

Interestingly enough, the Defendants have chosen not to put forth any of their own expert testimony to contradict or otherwise undermine the opinions proffered by the Plaintiffs' experts. The Defendants have chosen only to take out of context certain portions of the Plaintiffs' experts' deposition testimony in an effort to discredit their investigation. Even if Defendants had proffered expert opinions of their own, and in turn developed different theories as to the cause and origin of the fire, there still exists more than enough tangible evidence on the record for the Plaintiffs' experts to state their case. The law is clear, "once an expert has shown that the methodology or principle underlying his or her testimony is scientifically valid and that it 'fits' an issue in the case, the expert testimony should be put to the trier of fact to determine how much weight to accord the evidence." *DiPetrillo*, 729 A.2d at 689-90.

Moreover, since *Daubert*, the courts of appeals have made significant contributions to an understanding of how to separate reliable from unreliable science and how to apply the intuitive idea of "fit" -- as courts have come to call the special kind of relevance that *Daubert* demands -- to live litigation scenarios. *See, e.g.*, *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252-54 (1st Cir. 1998); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316-22 (9th Cir. 1995). Nonetheless, choreographing the *Daubert* purview remains an exceedingly difficult task. *Ruiz-Troche,* 161 F.3d at 81. Few federal judges are scientists, and none are trained in even a fraction of the many scientific fields in which experts may seek to testify. *Id.*

Magistrate Judge Almond also cited *Cortes-Irizarry v. Corporacion Insular De Seguros*, where the court reasoned that *Daubert* can be used in connection with summary judgment motions but that does not mean that it should be used profligately. *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1997). A trial setting normally will provide the best operating environment for the triage, which *Daubert* demands. *Id. Voir dire* is an extremely helpful device in evaluating proffered expert testimony, and this device is not readily

available in the course of summary judgment proceedings. *See United States v. Sepulveda*, 15 F.3d at 1161, 1184. Moreover, given the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most "clearcut" cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage. The *Cortes-Irizarry* court concluded, "therefore, at the junction where *Daubert* intersects with summary judgment practice, *Daubert* is accessible, but courts must be cautious -- except when defects are obvious on the face of a proffer -- not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility." *See* Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test*, 78 Minn. L. Rev. 1345, 1379-80, 1381 (1994).

One of the most problematic details of Magistrate Judge Almond's Report is that he refers to Plaintiffs' case as "clearcut" in terms of the non-admissibility of the experts' testimony. Plaintiffs contend that this is far from the case. First, the court in *Cortes-Irizarry* never defines what a "clearcut" case is, nor cites to any existing case law to provide guidance as to what kind of proffered expert testimony might fall under this category. Second, plaintiff further asserts that the evidentiary record is replete with testimony, investigation reports and reference manuals to guide this Court as to the reliability of the experts' testimony. *Daubert* outlines a list of four nonexlusive factors in order determine the validity of expert testimony. These factors include: (1) the proffered knowledge has been or can be tested; (2) the theory or technique has been the subject of peer review and publication; (3) there is a known or potential rate of error; and (4) the theory or technique has gained general acceptance in the scientific community. *Daubert*, 509 at 593-594. Magistrate Judge Almond's Report is devoid of any analysis on these factors.

Further, Magistrate Judge Almond's Report quotes *Ruiz-Troche,* stating "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 161 F.3d 77. In the instant matter, Plaintiff does not believe this to be true. Although

Plaintiffs' experts could not precisely state whether the heating sensor was the ignition source of the fire because the unit was destroyed, they nevertheless opined that the burn patterns dictated that some component of the heating subsystem within the water dispenser, which included the insulated wires, wire connections and thermal switches, was source of ignition. (Exhibit A – Depositions of Nalbandian and Cooney). Given the total destruction of the electrical subsystem, Nalbandian and Cooney concluded, after a full investigation, that the fire was caused by the design defect of placing a high chloride content insulation against the stainless steel tank, causing the tank to crack and corrode, allowing water and corrosion to escape and come into contact with the electrical heating subsystem, which caused it to malfunction and overheat igniting plastic within the water dispenser. (Exhibit A –Depositions of Nalbandian and Cooney). Even if the Plaintiffs' experts could not pinpoint the heat sensor as the exact ignition point, their opinion that another component located within the surrounding radius of the heat sensor could have be the ignition source does not constitute a "great analytical gap."

Moreover, Magistrate Judge Almond's Report states, "Hartford's counsel essentially asked me to take judicial notice of this analytical leap by arguing at the hearing, without citation to any supporting authority as required by FRE 201(d), that it is a 'basic tenet of any material performance academia that electrical components when exposed to corrosion and water short and cause fires." In *Daubert*, the court noted, in relation to FRE 104(a), in footnote, "indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under FRE 201." 509 US 593.

In John D. DeHaan, Ph.D, 4th Edition of *Kirk's Fire Investigation*, commenting on the effect of water and moisture on electrical components it is stated, "small amounts of impure water can play a role in triggering arc tracking on insulators, but it can also cause corrosion that can result in high-resistance, heat-producing connections." John D. DeHaan, Ph.D, Kirk's *Fire Investigation*, 4th Edition, Brady Prentice Hall at 255. *See also* Exhibit B. These connections create localized heat, pyrolysis of their insulative supports and additional current flows as the

char develops. *Id.* When water enters electrical equipment, it can provide additional paths for the current, in parts of equipment that are not meant to carry such currents. *Id.* The presence of water, in addition to providing a potential electric shock danger, had been seen to cause fires by allowing current flows along unplanned paths. *Id.*

Dr. DeHann further commented, even the smallest discernible arc, however, is a serious hazard in a combustible gas or vapor. *Id.* at 254. Ignition by electrical means is caused by conduction heating or arcing conditions. *Id.* Therefore degradation of such insulators by applying heat produces a carbon char, which is an electrical conductor. *Id.* When it occurs in a limited area between conductors it is often called arc tracking or carbon tracking. *Id.* The result of this is that something that is supposed to be an insulator becomes a conductor, often over an extended time and at such a slow rate that it is not readily detectable until the conductive path it creates can conduct so much current that massive heating can occur. *Id.* For instance, if an insulator absorbs moisture, a small current can flow, producing some heat. *Id.* This heat can slowly degrade organic insulation in the vicinity and turn some of it to carbon. *Id.* Once enough carbon is formed between the conductors, more current can flow along the carbon path, providing localized heating and further degradation. *Id.* As the process continues, the current progressively increases as more and more carbon is formed. *Id.* An arc may be struck and the carbonized insulation ignites, resulting in a possible fire. *Id.* **This situation is more prevalent in inexpensive electrical appliances where low quality insulation in used**. (Emphasis added). *Id.* at 254-255.

Further, dry arc tracking also has a wet counterpart. Alan S. Brown, *Investigating Electrical Fires*, National Electric Code Digest, Fall 2003. *See also* Exhibit C. Current will flow through water or moisture contaminated with dirt, dust, salts or minerals. *Id.* Most of the time, current will heat the path and evaporate the liquid. *Id.* But if the moisture is continuously replenished, the resulting heat could degrade insulation or even create an electrical pathway from contaminants left behind when the moisture evaporates. *Id.*

In his summary of the *Aging and Durability of High Temperature Electrical Insulation Final Report,* Clarence Wolf stated, "we have shown that the primary mode of failure of fluorinated thermoplastic co-polymers used as electrical insulation is stress cracking. Clarence Wolf, *Aging and Durability of High Temperature Electrical Insulation Final Report,* Washington University, September 1, 1995 – August 31, 1999, Page 1. *See also* Exhibit D. Furthermore, we have observed that the cracks can be directly correlated with the thermal degradation of the insulation. *Id.*

Lastly, Magistrate Judge Almond's Report states that Nalbandian and Cooney's theory is "no more than unsupported speculation and is thus inadmissible." During an investigation, whether an investigator completes an accurate report "comes down to whether a professional follows the industry's 'standard of care' for collecting and analyzing evidence. Alan S. Brown, *Investigating Electrical Fires*, National Electric Code Digest, Fall 2003. *See also* Exhibit C. Fire investigators already have a standard of care in place: NFPA 921: *Guide for Fire and Explosion Investigations*. *Id.* It is the only peer reviewed, consensus document on fire investigation in the world. *Id.* NFPA 921 does more then set standards for fire investigation methodology. *Id.* It provides investigators of electrical fires with an essential guide. *Id.* This is the same guide that Plaintiffs' experts used in their investigation.

It is extremely important to note that at the beginning of their investigation, Nalbandian and Cooney disassembled the water dispenser and removed the hot and cold water assemblies along with the insulation covering the hot water tank. (Exhibit E – Thielsh Engineering Report). Beyond an exhaustive visual examination of the various components, the burn patterns and damage, an energy dispersive x-ray spectroscopy was performed on portions of the stainless steel tank and insulation to determine their elemental composition. *Id.* Further, pieces of the stainless steel tank were removed and subjected to carrying levels of magnification. *Id.* It was only after these extensive examinations and tests that Nalbandian and Cooney came to a conclusive theory.

Their opinions in this case, therefore, appear well supported by science rather than mere speculation.

Again, the Defendants have provided no expert testimony in any respect to contradict the opinions, science or methodology of Plaintiffs' experts.

B. IF THIS COURT FAILS TO REVERSE THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE ALMOND, IT SHOULD IN THE ALTERNATIVE, ALLOW AN EVIDENTIARY HEARING TO HEAR TESTIMONY OF THE PLAINTIFFS' EXPERTS.

When faced with a proffer of expert scientific testimony, the trial judge must determine, at the outset, pursuant to FRE 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. 579.

In *State v. Quattrocchi,* the court placed a burden "on the opponent of the expert to come forward with evidence showing deficiencies in the expert's testimony before the court has any obligation to engage in a Rule 104(a) analysis." *State v. Quattrocchi,* 681 A. 2d 879 (1996); *see also,* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 50-51 (West 1994) (quoted material) (*Daubert* leaves it to the courts to determine opponent's burden of showing deficiencies in the expert's testimony before the court has any obligation to engage in a Rule 104(a) analysis). By way of guidance, *Quattrocchi* plainly indicates that (apart from mandatory situations, which are not present here) a trial justice is not absolutely required to convene a hearing whenever a Rule 104 motion is filed, but is so obliged only if proffered scientific evidence is challenged "by an appropriate objection or motion to suppress." 681 A.2d at 884.

Following a review of the record, the court in *Cortes-Irizarry* concluded "we need go no further." 111 F.3d at 191. After scrutinizing the entire record in the light most favorable to the plaintiff, rational jurors could find all the elements of [plaintiff's case]. *Cortes-Irizarry*, 111 F.3d at 192. Though the Plaintiff's evidence may appear thin to some, it establishes factual

disagreements as to which reasonable minds may differ. *Id.* No more is exigible. *See Greenburg v. P.R. Mar. Shipping* Auth., 835 F.2d 932, 936 (1987). **The ground rules associated with summary judgment practice "admit of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record.**" *Id.*

The court in *Cortes-Irizarry* stated the defendant's evidence on the issue of causation, as compelling as it might have seemed, did not warrant the entry of summary judgment. 111 F.3d at 191. The plaintiff articulated an alternative theory of causation and supported it with expert testimony as to the causal nexus. *Id.* At the same time, [plaintiff] cast doubt on the defendant's theory of causation. *Id.* This evidence sufficed to create a trial worthy issue *vis-à-vis* the element of causation. *See Coyne v. Taber Partners I*, 53 F.3d 454, 460 (explaining that "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage"); *see also United States* v. *Kayne*, 90 F.3d 7, 12 (1st Cir. 1996) (stating that disagreements among experts are "properly the subject of searching cross-examination" at trial), *cert. denied*, 136 L. Ed. 2d 607, 117 S. Ct. 681 (1997).

As to causation, the *Cortes-Irizarry* court further noted, legal rules of this sort acquire added significance on summary judgment because FRE 56 "contemplates an abecedarian, almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and the most flattering inferences which can reasonably be drawn therefrom are sufficient to create any authentic question of material fact." *Greenburg*, 835 F.2d at 936.

In the instant matter, the Defendants contend that the Plaintiffs' experts are unable to offer a valid opinion that the water dispenser was the proximate cause of the fire. When dealing with electrical fires, "electricity may be the cause, but that doesn't tell you the heat source, the fuel it ignited and how the two came into contact." Alan S. Brown, *Investigating Electrical Fires*,

National Electric Code Digest, Fall 2003. To find out investigators must pinpoint a fire's origin. *Id.* The investigators evaluate thermal patterns from areas consumed by fire and patterns left on noncombustible items like sheetrock. *Id.* Some areas release more heat because of ventilation or fuel. *Id.* A trained investigator can read those patterns and make determinations. *Id.* Large fires burn away most evidence, but electrical fires can lead investigator's to the fires origin. *Id.* Fires char the polyvinyl chloride insulation on wires. *Id.* This makes PVC a semiconductor. *Id.* If the wire is still live, current will then arc across it. *Id.* This often severs the wire, cutting off current downstream of the arc. *Id.* This means the arc furthest away from the power source is located closest to the fire. *Id.*

Similarly here, the Plaintiffs' origin expert pin-pointed the origin of the fire and the court accepted his testimony. Based upon their findings and the findings of the origin expert, Nalbandian and Cooney developed a theory. The Plaintiffs' have proffered evidence to support each and every element of its case and this matter should be ripe for trial. Defense counsel's own opinion as to what he thinks does not hold any water in a court of law.

## CONCLUSION

For the foregoing reasons, the Plaintiff prays that this Court not accept Magistrate Judge Almond's recommendation that summary judgment enter in favor of the Defendants and allow Plaintiffs to proceed to trial. In the alternative, Plaintiffs request a preliminary hearing to address whether their experts' testimony is relevant, reliable and will assist the trier of fact in determining the issues in dispute.

Respectfully submitted,
Plaintiff,
By and Through Her Attorneys,

/s/ Robert D'Amico, II, Esq.

Robert A. D'Amico, II, Esq. #4593
**D'AMICO · BURCHFIELD, LLP**
536 Atwells Avenue
Providence, RI 02909
Main 401-454-1212
Fax 401-454-1233
rad@dblawri.com

**CERTIFICATE OF ELECTRONIC SERVICE**

I, the undersigned, hereby certify that a true and correct copy of the above and foregoing was transmitted electronically to the following attorney(s) of record, on this 12th day of October, 2007.

Rodd E. Elges, Esq.
CLAUSEN MILLER, P.C.
10 South LaSalle Street
Chicago, IL 60603-1098
relges@clauson.com

Joseph-Anthony DiMaio, Esq.
McKennon & Harwood
1168 Newport Avenue
Pawtucket, RI 02861
contact@mckinnonharwood.com

Erik Loftus
Law Offices of Stuart Blackburn
Two Concorde Way
PO Box 608
Windsor Locks, CT 06096
eloftus@sbcglobal.net

Kevin Cotter, Esq.
Van Tienhoven & Cotter, Ltd.
312 South Main Street
Providence, RI 02903
ravt.ksc@conversent.net